[No. S004418, Crim. No. 22461. Oct. 6, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
FERNANDO EROS CARO, Defendant and Appellant.

1036

1040

COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, Reil Rosenbaum and Jill Ishida, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Donald E. Niver and Don Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PANELLI, J.—Defendant was convicted of first degree murder of Mary Booher and Mark Hatcher (Pen. Code, § 187),[1] kidnapping of Mary Booher (§ 207) with a firearm use finding (§ 12022.5), assault with intent to murder of Rick Donner and Jack Lucchesi (§ 217) with findings of intentional infliction of great bodily injury (§ 12022.7) and firearm use (§ 12022.5) as to each assault. Two multiple-murder special circumstances under the 1978 death penalty law were also found true (§ 190.2, subd. (a)(3)). The jury returned a verdict of death on each murder count; the appeal is automatic. (§ 1239, subd. (b).)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

We conclude that one of the multiple-murder special circumstances must be set aside. In all other respects we affirm the judgment.

## I. GUILT PHASE

A. *Facts.*

### 1. *The Booher-Hatcher Murders and Booher Kidnapping.*

Mary Booher and Mark Hatcher were cousins, 15 years old. About 7 p.m. on August 20, 1980, they left Hatcher's home in rural Fresno County for an after-dinner bicycle ride. About a half-hour later Hatcher's mother and grandmother went out for a walk, to meet the youths as they returned from their ride. As the women walked, they heard a single gunshot from the direction of an orchard behind the house and shortly thereafter saw a pickup truck leaving the orchard on an oiled access road. Some minutes later they returned with a flashlight and found Hatcher's body on a road in the orchard, shot in the face. Later examination revealed that the shot had been fired at a range of six to twenty-four inches.

The bicycles were found the following day in an irrigation canal about eight miles from Hatcher's home.

Booher's body was discovered on August 25 in an orange grove a few miles away, also shot in the head. The body was leaning against the lower branches of a tree, in a position consistent with having fallen there or with having been dumped. It was missing a rubber thong from one foot, and there were barefoot impressions on the ground nearby. Otherwise the body was fully clothed, and there were no indications of sexual activity. The body was in a state of decomposition consistent with its having been dead for four to five days, and the presence of undigested food in the stomach indicated that death had occurred within two hours of a meal.

### 2. *The Donner-Lucchesi Assaults.*

About 8:20 p.m. on August 20, 1980, Rick Donner and Jack Lucchesi were standing in the parking lot of a bar at an intersection about two miles from the scene of the Hatcher slaying. A pickup truck approached the intersection, proceeding somewhat erratically. It entered the parking lot and Donner observed the driver, later identified by both Donner and Lucchesi as defendant, to be looking down at the seat or floor of the cab. The pickup cut across the lot and as it exited, its right rear fender glanced against Donner's parked car, causing slight damage. The truck did not stop, and Donner and Lucchesi gave chase in their own vehicles.

After about five minutes the truck pulled to the side of the road and stopped, Donner and Lucchesi pulling in behind. The driver got out and stood facing the men, with his left hand hidden inside the cab. Lucchesi walked towards him and the driver put up his right hand and said "don't hurt me" several times. Lucchesi asked him why he had not stopped back at the bar, and the driver said he had been afraid they might beat him up. Lucchesi said no one was going to hurt him, and asked if he had any insurance. A bicycle was visible in the bed of the truck.

Suddenly the driver's expression changed and Lucchesi stepped back toward the middle of the road. The driver withdrew his left hand from the truck holding a revolver, which he fired at Lucchesi, hitting him above his right eye and knocking him to the pavement. He then fired two shots at Donner, hitting him once in the thigh. Approaching Lucchesi where he lay on the road the driver shot him once more in the chest. He then fired two more shots at Donner, who by this time was escaping through the orchard by the side of the road. Both shots missed, but Donner heard the bullets fly past him as he fled. Then, hearing the gun click empty, Donner turned and saw the driver get back in the truck and drive away.

Donner continued through the orchard to a house about 200 yards back along the road. Lucchesi made his way there also a short time later, having managed despite serious injuries to get into his vehicle and back it up to the driveway. The occupant of the house summoned police and an ambulance. Both men survived the shootings, but Lucchesi was left functionally blind in one eye.

### 3. *Defendant's Arrest and Interview.*

Within a few days of the incidents described above, defendant's supervisor at the Fresno chemical plant where he worked saw a police sketch in the newspaper based on Donner's description of his assailant and noted that it resembled defendant. The supervisor recalled that defendant owned an orange Chevrolet stepside pickup truck such as the one described in the newspaper account of the assaults, that defendant had not driven the pickup to work since the shootings, and that he had also seen defendant in the past with a large caliber handgun. The supervisor related this information to an acquaintance in the sheriff's department, and on August 25 defendant was arrested at the plant for murder and kidnapping. As defendant was being escorted to the locker room to change his clothes he broke free and ran, but was soon caught.

At the police station, defendant told officers he knew they were "going to come get me" because he looked just like the person in the sketch. He said

that that was why he had shaved off his moustache the day before and parked his truck in his garage. He said there was damage to the side of the truck such as they were seeking.

Defendant waived his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), and denied being involved in either the Booher-Hatcher killings or the Donner-Lucchesi assaults. He said that on August 20 he was at home with his girlfriend, Cathy Lozano, from 4:30 p.m. onward, and that from 8 to 11 that evening they were watching television. He gave police consent to examine a .357-caliber Colt Python revolver owned by Lozano, and his orange Chevrolet stepside pickup truck. He said that he normally drove the truck to work but that around August 15 a car had collided with it in a store parking lot and it had sustained damage similar to that reportedly later done to the truck in the Donner-Lucchesi incident. He said that after he heard about the incident he thought the condition of the truck might arouse suspicion, so he decided to leave it in his garage and use Lozano's car to get to work. He denied that there had been a bicycle in his truck on August 20.

### 4. *Ballistics and Other Evidence.*

The police searched defendant's apartment in Fresno with his consent and seized Lozano's gun. Lozano said she had been away from the apartment between August 18 and midnight on August 20, and that she did not have the gun with her during that time. Two or three hours before she returned on the night of August 20 she had a telephone conversation with defendant in which he told her that he had had a "hassle" with two men and had "had to pull a gun."

Police experts determined that a bullet fragment removed from Hatcher's brain had been fired from Lozano's gun. The same was true of a bullet recovered from the wall of the house to which Donner fled from his attacker.

Paint on Donner's car from the collision matched defendant's truck, and tire tracks at the site of the assaults and near Booher's and Hatcher's bodies were consistent with the truck's tires. Donner recalled the license number on his assailant's truck as "30079N" or "30779N." Defendant's truck license number was "30997N." Shoe prints near both bodies matched prints in defendant's garage, although police found no shoes in defendant's possession which could have made the prints.

### 5. *Defendant's Case.*

Defendant did not testify. The thrust of his evidence and argument was to expose discrepancies in the prosecution's case and to attack the sufficiency

of the evidence on the various counts. In particular, in arguing against the kidnapping charge, counsel disputed the prosecution's contention that defendant transported Booher in his truck to the orange grove and that she was still alive when she was moved. In addition he argued absence of motive for either of the killings.

### B. *Jury Selection.*

After the jury was selected and sworn, the court recessed for the weekend with plans to select two alternate jurors the following week. When court convened on the day set for selection of the alternates, however, one of the jurors was excused due to a family illness. To fill the vacancy, the court proposed to select three alternates rather than the two originally planned, and to have one of those take the place of the juror who had been excused. Both sides agreed to this procedure, and the three alternates were selected. The prosecution used all three of its allotted peremptory challenges and defendant used two.[2] One of the alternate jurors so selected was then seated on the jury.

Defendant claims that this procedure improperly denied him the use of his 26 allotted peremptory challenges, of which he had used only 18 when the panel was sworn. (The prosecution had used 14 of its allotted 26.) Defendant contends that, upon the excuse of a sworn juror prior to the selection of the alternates, the court had a duty under *In re Mendes* (1979) 23 Cal.3d 847 [153 Cal.Rptr. 831, 592 P.2d 318], and *People* v. *Armendariz* (1984) 37 Cal.3d 573 [209 Cal.Rptr. 664, 693 P.2d 243], to reopen jury selection and to allow defendant to exercise any of his remaining eight peremptory challenges against any of the already seated jurors. Failure to do so, he argues, was cause for reversal.

In *Mendes, supra,* 23 Cal.3d 847, this court held that, for double jeopardy purposes, where a trial court has indicated that a trial will be conducted with alternate jurors, impanelment is not complete until the alternate jurors are sworn. (*Id.* at p. 853.) We further held that in a situation similar to the instant one the trial court did not abuse its discretion in allowing the exercise of unused peremptory challenges against jurors already sworn. (*Id.* at p. 855.) We noted that there is often an appreciable interval between the swearing of a juror and the point at which the jury is deemed complete, during which time a peremptory challenge may be made to the juror where there is good cause for the earlier failure to do so. A change in the composition of the panel, we observed, constitutes good cause. (*Ibid.*) In *Armendar-*

---

[2] The court followed the procedure set out in section 1089, which provides in pertinent part that in the selection of alternate jurors "the prosecution and the defendant shall each be entitled to as many peremptory challenges . . . as there are alternate jurors called."

*iz, supra,* 37 Cal.3d 573, we relied on *Mendes* to reverse a conviction where a trial court denied a defendant's request to exercise some of his twenty-two unused peremptory challenges against already seated jurors after two jurors were excused prior to the swearing of five alternates.

Defendant cites no case, however, in which this reasoning has been applied on direct appeal to overturn a conviction for error in the jury selection process where the defendant registered no objection. Rather, the defendant in such a situation may not be heard to complain absent a showing of prejudice. ▮ ▮▮ ▮ (*People* v. *Patterson* (1943) 58 Cal.App.2d 837, 843-845 [138 P.2d 341]; *People* v. *Kennedy* (1937) 21 Cal.App.2d 185, 200-201 [69 P.2d 224]; see *Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 203 [288 P.2d 12].)[3] ▮ Had defendant requested that the court reopen jury selection and been refused, he would have a claim for reversal under *Armendariz, supra,* 37 Cal.3d 573. The instant case is distinguishable, however, inasmuch as there is no indication that defendant was in any way dissatisfied with the panel as it was constituted. Defendant's reliance on *People* v. *Diaz* (1951) 105 Cal.App.2d 690 [234 P.2d 300], and *People* v. *O'Connor* (1927) 81 Cal.App. 506 [254 P. 630], is similarly unavailing, as the defendants in both those cases made their objections known at the time the purported errors occurred. Here, by contrast, defense counsel stipulated to the procedure.

Defendant argues that counsel's failure to object to the procedure adopted by the court constituted ineffective assistance. Moreover, he asserts that counsel's failure to act stemmed from ignorance rather than any conceivable tactical consideration, and that we must reverse since we cannot infer from the record that had counsel been aware of the holding in *Mendes, supra,* 23 Cal.3d 847, he would not have requested the reopening of the panel to peremptory challenges. As already noted, however, defendant does not allege that either he or counsel was dissatisfied with the panel. Thus, no prejudice has been shown from his counsel's asserted ignorance, and his claim of ineffectiveness of counsel must therefore fail. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; *Strickland* v. *Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052].)

C. *Admissibility of Posthypnosis Testimony of Rick Donner.*

The first and second day after the shootings, Rick Donner took part in two sessions in which law enforcement personnel purportedly hypnotized

---

[3]This is the logical corollary of the long-held rule that a party objecting to errors in the jury selection process must exhaust all available peremptory challenges in order to preserve the objection for appeal. (*People* v. *Winthrop* (1897) 118 Cal. 85, 88 [50 P. 390]; *People* v. *Estorga* (1928) 206 Cal. 81, 85-87 [273 P. 575]; *People* v. *Hernandez* (1979) 94 Cal.App.3d 715, 719 [156 Cal.Rptr. 572].)

him in order to enhance his memory of the events of August 20. While Donner was informed only of the general purpose of the sessions, the officers' specific objective was to get him accurately to recall the license number of the pickup truck driven by his assailant. The first session, conducted in the hospital, lasted about two hours. It was not recorded, due to a malfunctioning tape recorder, and no transcript was prepared. The second session, at Donner's home, lasted about an hour and was taped and transcribed. Neither session yielded the information the officers sought.

Before trial, defendant moved to prevent Donner from testifying on the ground that his hypnotic experience had rendered him incompetent as a witness.[4] Defendant called Dr. Bernard Diamond, an expert on hypnosis, who testified to its damaging effects on the reliability of subsequent recollection. The prosecution presented its own expert, Dr. David Spiegel, who contested the views of Dr. Diamond and who also opined that Donner had never actually been hypnotized. Spiegel based his opinion on (1) a review of the record of the second hypnotic session and an interview with the officer who conducted it, which revealed that Donner had responded to the officer's inquiries with little if any emotion and in the past tense rather than the present, and (2) the results of a "Hypnotic Induction Profile" (HIP) test Spiegel performed on Donner to determine Donner's "hypnotizability."

The officer who conducted the first session testified that Donner generally responded in the past tense to her prompts and questions. She was not asked whether she thought Donner had actually been hypnotized during the session, and offered no opinion in that regard. The officer who conducted the second session testified that he could not be sure whether Donner was hypnotized or not, but did state that he did not consider Donner a good subject for hypnosis at the time "because of his movements." He also testified that he was "disappointed" to hear Donner speak in the past tense during the session, because it was an indication that Donner was "not in a very deep state [of hypnosis], if at all."

Donner testified that he did not feel he had been hypnotized at either session. While he could not account for the fact that the first session, which he remembered as lasting only 20 minutes, had actually lasted about 2 hours, the evidence showed that he had received a morphine injection the previous evening for pain and that the drug has a lingering sedative effect.

---

[4] In *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 641 P.2d 775], this court ruled inadmissible the testimony of any nondefendant witness who has been hypnotized for the purpose of restoring his or her memory of the events in issue, and that the prejudicial effect of erroneous admission of such testimony is to be judged under the "reasonable probability" test of *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. In *People* v. *Guerra* (1984) 37 Cal.3d 385 [208 Cal.Rptr. 162, 690 P.2d 635], we held that *Shirley* was to be applied retroactively.

The court found that Donner had not in fact been hypnotized, and denied defendant's motion.

■ Defendant contends that the court's ruling was error because it was based on the opinion of Dr. Spiegel, which was based in turn upon the results of the HIP test. He argues that the court should have disregarded Dr. Spiegel's opinion because the HIP test did not meet the *Kelly-Frye* standard (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013) of "[general] accept[ance] as reliable in the scientific community in which it [was] developed." (*Guerra, supra,* 37 Cal.3d at p. 410.) Defendant raised no such objection below. (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].) Nevertheless, he urges that we address his objection here or find alternatively that counsel's failure to raise the issue below constituted ineffective assistance.

We conclude that defendant's argument must fail. The court's factual finding was based not only on Dr. Spiegel's opinion but on the testimony of Donner himself and of the officers who conducted and witnessed the sessions, all evidence supportive of a finding that Donner had not in fact been hypnotized. Dr. Spiegel's opinion in turn was not based solely on the result of the HIP test. Rather, Dr. Spiegel referred to a variety of data which he was qualified to interpret, and on which, as an expert witness, he was entitled to base an opinion. Viewing the evidence in the light most favorable to the trial court's finding, there was substantial evidence to support the finding, and it must be upheld on appeal. (See *People* v. *Ratliff* (1986) 41 Cal.3d 675, 686 [224 Cal.Rptr. 705, 715 P.2d 665].)

D. *Sufficiency of Evidence to Support the Finding of First Degree Murder as to Hatcher.*

■ Defendant claims that there was insufficient evidence as a matter of law to support the jury's finding of premeditation and deliberation as to the Hatcher murder, and that defendant's conviction of first degree murder on the Hatcher count must be reversed.[5]

---

[5] The only theory of first degree murder on which the jury was instructed was premeditation and deliberation. The instruction was in the words of CALJIC No. 8.20 (1979 rev.) as follows: "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree.

"The word 'willful' as used in this instruction means intentional.

"The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditated' means considered beforehand.

"If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so

In *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], we identified three categories of evidence which have been found sufficient to sustain a finding of premeditation and deliberation: (1) facts showing planning activity; (2) facts suggesting motive; and (3) facts about the manner of killing which suggest a preconceived design. Although the evidence was not particularly strong on any one of the *Anderson* factors, the record reveals at least some support in each of the categories.

As to planning, the evidence shows that defendant armed himself and that he went in his pickup truck to the orchard. There it appears that he walked or ran into the orchard at a location about 200 feet from where Hatcher's body was found and that he proceeded toward that location in an irregular course roughly paralleling the road, evidence the prosecutor argued was supportive of an inference that defendant stalked Booher and Hatcher before attacking them.

As to motive, there is no evidence of a prior relationship. The jury could reasonably infer, however, that defendant killed Hatcher either because Hatcher had witnessed the kidnap of Booher or because defendant intended to kidnap her and wished to eliminate Hatcher as a potential witness. Defendant argues that he could just as easily have kidnapped Booher in a panic following the unpremeditated killing of Hatcher; however, the jury was entitled to infer from the difficulty and risk inherent in kidnapping Booher, as opposed to simply shooting her at the scene, that his intent to take her alive was overriding and provided a motive for the killing.

As to the manner of killing, a close-range gunshot to the face is arguably sufficiently "particular and exacting" to permit an inference that defendant was acting according to a preconceived design. (See *People* v. *Cruz* (1980) 26 Cal.3d 233, 245 [162 Cal.Rptr. 1, 605 P.2d 830].)

"Although the evidence was far from overwhelming, we need not be convinced beyond a reasonable doubt that defendant premeditated the

---

that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.

"The true test is not the duration of time but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include[s] an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

"To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice, and having in mind the consequences, he decides to and does kill."

[murder]. The relevant inquiry on appeal is whether ' "*any* rational trier of fact" ' could have been so persuaded. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], quoting from *Jackson* v. *Virginia* [1979] 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781], italics original.)" (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1020 [245 Cal.Rptr. 185, 750 P.2d 1342].) The evidence in this case meets this test.

## II. SPECIAL CIRCUMSTANCE FINDINGS

 Defendant contends that it was error to charge him with two multiple-murder special circumstances rather than one. He is correct. We have repeatedly held that regardless of the number of murders charged in an information it is error to charge more than one special circumstance alleging multiple murder. (See, e.g., *People* v. *Kimble* (1988) 44 Cal.3d 480, 504 [244 Cal.Rptr. 148, 749 P.2d 803]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115].) Accordingly, one of the multiple-murder special circumstances should be set aside.

## III. PENALTY PHASE

### A. *Facts.*

#### 1. *Prosecution Evidence.*

In addition to presenting evidence of the guilt phase crimes, the prosecution at the penalty phase put on evidence of two prior uncharged murders, a prior kidnapping conviction stemming from a forcible kidnap and rape, and two escape attempts.[6]

##### a) *The Prior Uncharged Murders.*

In April 1980 the bodies of two unidentified teenage girls were found in an orchard near Bakersfield in Kern County, about 100 miles south of Fresno. Both had been recently shot in the head. One of the victims had been bound at the wrists and ankles. The other was partially clad and was unbound. The latter victim showed signs of recent sexual activity; sperm and semen were found in the victim's vagina and rectum. Pubic hairs found on a nylon jacket near the body were indistinguishable from defendant's. A bullet fragment recovered at the scene was incontrovertibly shown to have been fired from the revolver belonging to defendant's girlfriend Cathy

---

[6]The court had granted defendant's motion for separate guilt phase and penalty phase juries.

Lozano. Tire tracks near one of the bodies, while they could not have been left by defendant's truck, were not inconsistent with Lozano's car.

Evidence from defendant's time cards showed that he was working in Fresno on the dates the killings had to have occurred. It would have been possible, however, for him to drive from Fresno to the Bakersfield area and back again between clocking out on one of the two nights in question and clocking back in the next day. Lozano was outside the state at that time, with her car but without her revolver, which she believed to be in defendant's possession.[7]

### b) *The Prior Rape and Kidnap.*

Defendant admitted that he had been previously convicted of kidnapping and that five years had not elapsed since the conclusion of his state prison term for that offense.

The victim, Deborah S., testified that defendant picked her up hitchhiking to her job as a law clerk in San Diego in October 1975. She was 27 years old. After she got in his car he pulled a gun on her and drove more than 50 miles out of the city into the desert, where he raped her. Defendant then told Deborah he would drive her to El Centro where she could get a bus back to San Diego. When he appeared to be bypassing the town, however, Deborah struggled with defendant and escaped from his moving car. Defendant was charged with kidnapping (§ 207) and rape (§ 261), with a gun use allegation (§ 12022.5). In May 1976 he pled guilty to kidnapping; the rape charge and gun use allegation were dismissed.

### c) *The Attempted Escapes.*

On July 8 and November 17, 1981, defendant attempted to escape from the superior court holding facility. In both incidents defendant struggled with sheriff's deputies before being subdued and returned to his cell.

### 2. *Defense Evidence.*

Defendant did not testify at either phase of the trial. At penalty phase, he presented evidence casting doubt on his guilt in the uncharged murders. He also introduced extensive background and character evidence by way of the

---

[7] The jurors were instructed that, in order to consider the evidence of either one of these murders in aggravation, they must find beyond a reasonable doubt that defendant had committed it, and their finding must be unanimous. At the end of their deliberations, they reported, on the special verdict forms provided, that they did not unanimously find beyond a reasonable doubt that defendant had committed either of the killings.

testimony of his parents, a brother, childhood and other friends, his high school coach, his brother-in-law, his ex-wife, his girlfriend Cathy Lozano, his supervisor from his job in Fresno and a vocational instructor from the California Correctional Institution at Tehachapi where defendant served his prison term for the 1975 kidnapping. In addition defendant presented the testimony of a clinical psychologist who had subjected him to a battery of psychological tests and of a licensed clinical social worker familiar with his case.

a) *Personal History.*

Born in 1949, defendant was the oldest of eight children of poor farm laborers in rural Imperial County. Defendant's father was an alcoholic and beat defendant's mother, who left the father three times before defendant was thirteen. Both parents were strict disciplinarians and often hit defendant as a child. The entire family was cold and emotionally distant from one another. Defendant did well in school, and was respected as a student and athlete, earning honors at every stage. He was well-liked in high school and in college, but had few if any close friends and was known as a person who handled his problems privately. He attended San Diego State University after high school, pursuing a major in engineering. He was active in community service activities and in ROTC. He dropped out of college his final year and joined the Marines, where he earned a lieutenant's commission and aviator's wings.

While still in college, defendant met Rosalyn Duran, whom he eventually married. Their relationship was far from smooth, however. Once during their courtship defendant took Duran against her will from her parents' home in San Jose to his apartment in San Diego, and from there to his parents' home in Brawley where he threatened her with a gun when she indicated that she was not sure she wanted to marry him. After the wedding they separated and reunited a number of times, defendant attempting suicide after one such separation. At the time of the Deborah S. kidnapping and rape, Duran was pregnant with the couple's second child and they were living with defendant's parents in Brawley.

Duran and defendant were divorced during his three-year term in Tehachapi, where he learned air conditioning and was a model inmate. Paroled in 1978, defendant moved to Fresno and found a job first as a watchman and then in the maintenance department of the chemical plant where he was employed at the time of his arrest in 1980. Despite their divorce, defendant and Duran remained close, and he occasionally visited her and their three children in San Jose. They also talked frequently on the telephone.

Defendant met Cathy Lozano in Fresno in 1978, and they moved in together about six months later. He helped her move to Arizona in February 1980, where she lived until about July, when she returned to Fresno and moved in with him again. After Lozano returned, they fought often, mostly about defendant's frequent calls from Duran. When they fought, Lozano testified, defendant would become "cold, distant . . . like another person." After one such fight in August 1980 Lozano moved out and went to stay at a friend's house. She returned after three days, but they fought again. Apparently during one of these arguments the revolver was out and defendant put it to his head, telling Lozano that if she wanted him dead he would kill himself. Lozano left again, and was gone another three days, during which time the charged murders and assaults occurred.

b) *Psychological Evaluation.*

Errol Leifer, a licensed clinical psychologist who had administered a battery of psychological tests to defendant but who was otherwise unfamiliar with defendant's background, testified that defendant was of superior intelligence but that he seemed periodically to lapse into a lower level of functioning in which he appeared to lose his grip on reality and to indulge in hostile and aggressive thoughts. He said that defendant manifested a sense of loneliness and separateness from other people, had difficulty attaching any emotions to his early memories, and that he produced punitive or otherwise disturbing associations to words having to do with family relationships. Dr. Leifer also said defendant exhibited low self esteem and that he appeared anxious to please. He testified that all of these traits were consistent with someone who was a victim of child abuse and with an unpredictable and explosive personality.

Lynn Woodward, a licensed clinical social worker, testified that she had interviewed defendant and his mother, and that she had familiarized herself with defendant's case and history through reviewing police, prison, probation, military and medical reports and taped interviews with family members and others who knew defendant. She testified that defendant was a victim of serious beatings as a child, that he felt "withdrawn and isolated" as a result, that he "overachieved" in order to get some kind of approval from his parents and others, that he had a lot of suppressed rage and was very sensitive to rejection, and that his bottled emotions could conceivably manifest themselves in periods of explosive, uncontrolled aggression. She said that on August 20, 1980, defendant was probably so devastated by his breakup with Lozano that he became extremely explosive and may have killed Booher and Hatcher in a rage at seeing what appeared to be a happy couple sharing something he felt he could never have.

B. *The Uncharged Murders.*

Prior to the guilt trial, defendant made the following alternative motions with respect to the prosecution's notice of circumstances in aggravation: (1) to strike or alternatively to demur to evidence of the uncharged murders; (2) to continue the penalty phase until after trial in Kern County on the uncharged murders or until the Kern County District Attorney's office should unequivocally state that it would not prosecute the offenses; or (3) for a "preliminary hearing" on the evidence of the uncharged crimes. The trial court denied the motions, possibly on the ground they were premature, since there was as yet no assurance that there would even be a penalty phase in the case.

After the guilt verdicts were returned, defendant raised the motions again, and the court, after hearing argument from both sides, denied the first two but granted the third. It then held a "preliminary hearing" at which it determined that there was probable cause to put the evidence of the uncharged murders before the jury. The court rejected defendant's requests (1) that an advisory jury be impaneled to hear the evidence of the uncharged killings, or (2) that the penalty phase jury hear that evidence first and a new jury be impaneled to hear the rest of the penalty phase evidence if the first jury did not find beyond a reasonable doubt that defendant committed the killings. The court did instruct the jurors, however, not to consider the evidence of either of the uncharged killings in aggravation unless they found unanimously that defendant had committed the killing beyond a reasonable doubt, and it provided the jury with special verdict forms for that purpose. The jury reported at the conclusion of its deliberations that it did not unanimously find that defendant had committed the killings.

Defendant contends that the admission of evidence of the uncharged murders violated (1) his state constitutional privilege against self-incrimination by putting him in the intolerable position of having to choose between exercise of that privilege and his right to testify at his trial, and (2) his federal and state due process right to be tried before a fair and impartial jury.

1. *The Right to Testify and the Privilege Against Self-incrimination.*

■ Defendant argues that by allowing the introduction of evidence of killings for which he might at some future date be tried, the court forced him to surrender his right to testify at penalty phase in order to preserve his state constitutional privilege against self-incrimination as to the uncharged offenses. He contends that without a continuance of the penalty trial, or a guaranty from the Kern County District Attorney's office that it would not

prosecute the killings, he was forced to remain silent and to give no mitigating account of himself for fear the prosecution would compel him to testify about the Kern County crimes on cross-examination.

The forced choice of which defendant complains is permissible under the federal Constitution. (See *McGautha* v. *California* (1971) 402 U.S. 183 [28 L.Ed.2d 711, 91 S.Ct. 1454].) In *McGautha* the United States Supreme Court held that Ohio's practice of determining guilt and penalty issues in a single "unitary" trial in capital cases violated neither the Fifth Amendment privilege against self-incrimination nor any federal constitutional right of the defendant to be heard on the issue of punishment,[8] even though it meant that the defendant would be forced to waive his privilege against self-incrimination on the issue of guilt if he chose to testify on the issue of punishment. (402 U.S. at pp. 213-220 [28 L.Ed2d at pp. 729-733]; see also *People* v. *Williams* (1988) 44 Cal.3d 883, 966, fn. 48 [245 Cal.Rptr. 336 [751 P.2d 395].) Curtailing the reach of earlier broad language in *Simmons* v. *United States* (1968) 390 U.S. 377, 394 [19 L.Ed.2d 1247, 1259, 88 S.Ct. 967], which had declared it "intolerable that one constitutional right should have to be surrendered in order to assert another[,]" the *McGautha* court observed: "The criminal process . . . is replete with situations requiring the 'making of difficult judgments' as to which course to follow. [Citation.] Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." (402 U.S. at p. 213 [28 L.Ed.2d at p. 729].)

Relying on *People* v. *Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024] (probation revocation proceeding), and *In re Ramona R.* (1985) 37 Cal.3d 802 [210 Cal.Rptr. 204, 693 P.2d 789] (juvenile court fitness hearing), defendant argues that he should have been given use immunity for any penalty phase testimony similar to that established in those cases. We need not resolve the issue, however, because it is clear that defendant was not prejudiced by the denial of use immunity.

The jury was ultimately instructed to disregard all evidence of the uncharged killings. Thus, defendant's failure to testify about them could not have been prejudicial. As to defendant's decision not to testify even as to general aspects of his background and character, we are not persuaded that it reasonably was caused by the lack of use immunity. Had defendant not testified about the killings on direct examination, any attempt to cross-examine him on that subject would not have survived a timely objection as to

---

[8] The United States Supreme Court consolidated two cases, *McGautha* v. *California* and *Crampton* v. *Ohio,* under the *McGautha* caption, *supra.* The challenge to Ohio's unitary trial system was raised by the Ohio petitioner.

scope. Thus, defendant faced no greater dilemma in that regard than that facing any witness whose testimony might be vulnerable to impeachment based on evidence of prior criminal activity.

### 2. *Due Process.*

■ Defendant contends that it was humanly impossible for the jurors, having heard and viewed two full days of testimony and numerous exhibits regarding the uncharged murders, to follow the trial court's instruction that absent a unanimous finding that defendant committed either of the killings beyond a reasonable doubt, they should disregard the evidence in its entirety. He notes that a finding such as that rendered by the jury that "[w]e . . . do not unanimously find the [defendant] committed [the] crime[s]," is quite different from an ordinary verdict of not guilty, in which jurors must unanimously *join*. Rather, he argues, it presents the possibility that as many as 11 jurors may actually have found to their individual satisfaction that he *did* commit the killings, making it impossible for them to ignore the evidence in their deliberations.

■ Jurors may only consider evidence of other crimes in aggravation of penalty under section 190.3, factor (b) if they find the other crime proven beyond a reasonable doubt. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 280 [221 Cal.Rptr. 794, 710 P.2d 861]; *People* v. *Robertson* (1982) 33 Cal.3d 21, 53 (plur. opn.), 60 (Broussard, J., conc.) [188 Cal.Rptr. 77, 655 P.2d 279].) There is no requirement of unanimity, however, and it is entirely proper under the statute for individual jurors who find the aggravating circumstance beyond a reasonable doubt to consider that evidence in the weighing process. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 773-774 [239 Cal.Rptr. 82, 739 P.2d 1250].) ■ Since it would have been permissible for each juror who did find that defendant had committed either or both of the uncharged killings beyond a reasonable doubt to consider that evidence in aggravation of penalty, the court's requirement of a unanimous special finding in that regard actually provided greater protection than that to which defendant was entitled under the statute.

■ As to the possibility that jurors who were not convinced of defendant's guilt in the uncharged crimes might have been influenced by the prejudicial effect of the evidence, such a risk is inherent in the introduction of any evidence of prior criminal activity under factor (b), and has been condoned by this court: "The penalty phase is unique, intended to place before the sentencer all evidence properly bearing on its decision under the Constitution and statutes. Prior violent criminality is obviously relevant in this regard; the reasonable doubt standard ensures reliability; and the

evidence is thus not improperly prejudicial or unfair." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 205, fn. 32 [222 Cal.Rptr. 184, 711 P.2d 480].)

C. *Admissibility of Testimony of Victim of Prior Kidnapping and Rape.*

■ Defendant argues that it was error to admit the testimony of Deborah S. about the 1975 forcible kidnapping and rape.

First he contends that since the rape charge and gun use allegation were dismissed pursuant to a plea bargain, any evidence of those offenses was barred under section 190.3, paragraph 3, which prohibits admission of evidence of criminal activity "for which the defendant was prosecuted and acquitted." He argues that, absent any contrary agreement, a dismissal obtained in exchange for a plea of guilty to another charge is made with the "[i]mplicit . . . understanding . . . that [the] defendant will suffer no adverse sentencing consequences by reason of the facts underlying, and solely pertaining to, the dismissed count." (*People* v. *Harvey* (1979) 25 Cal.3d 754, 758 [159 Cal.Rptr. 696, 602 P.2d 396].) We recently rejected the identical argument in *People* v. *Melton* (1988) 44 Cal.3d 713, 755-756 [244 Cal.Rptr. 867, 750 P.2d 741].) Moreover, the rape and gun use occurred during the course of the kidnapping for which defendant was convicted, and thus the underlying facts did not pertain solely to the dismissed counts. (Cf. *Harvey, supra.*)

Second, defendant contends that, since he admitted the kidnapping conviction, S.'s testimony should have been excluded as an impermissible attempt by the prosecution to show an element of force and violence unnecessary to the conviction. We have rejected similar arguments in *Melton, supra,* 44 Cal.3d at pages 754-755, and *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301].

D. *Admissibility of Evidence of the November 1981 Escape Attempt.*

■ During the guilt phase, the prosecution orally amended its notice of circumstances in aggravation to include an escape attempt by defendant which had occurred only two days before, on November 17, 1981.[9] Defendant's counsel made no objection, indicating only that he would need time to investigate the incident. The trial court granted the amendment, and at the penalty phase the prosecution introduced evidence about the escape attempt.

---

[9] This oral amendment was duly followed by a written notice filed on November 24.

Defendant now contends this was error. He relies on the language of section 190.3, paragraph 4, which requires that notice of evidence to be introduced at the penalty phase be provided "within a reasonable period of time as determined by the court, *prior to trial*." (Italics added.)

The purpose of the notice provision is to advise an accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty trial. (See *People* v. *Miranda, supra,* 44 Cal.3d at p. 96.) In *People* v. *Howard* (1988) 44 Cal.3d 375, 419-425 [243 Cal.Rptr. 842, 749 P.2d 279], we found no prejudice resulting from the prosecution's giving of notice of certain evidence at the end of the guilt phase when the prosecution first became aware of the evidence. The important factor, we stated, was that defendant was given extra time to prepare and never requested more. In the present case, the escape attempt did not occur until after the guilt phase was underway. Thus it would not have been possible to have given notice before the beginning of the guilt phase trial. The reasoning in *Howard* applies equally here, and the statutory purpose of the notice provision was fulfilled. We find no error in the admission of this evidence.

E. *Refusal to Limit Cross-examination of Defense Psychiatrist.*

Defendant proposed to call Dr. Samuel Benson, a psychiatrist, to testify that defendant suffered from "intermittent explosive disorder" and a "reality testing" defect, and that he was a borderline psychotic. Prior to calling the witness, however, defendant sought an order preventing the prosecution from cross-examining the witness on the subject of any statements defendant may have made to him about the crimes for which defendant was convicted at the guilt phase. Defendant maintained that while he had indeed spoken to Dr. Benson about the crimes, Dr. Benson at counsel's request had disregarded all such statements in reaching his diagnosis, basing it solely on defendant's statements about his history and upbringing and on police reports of the crimes themselves. Defendant proposed to make what he characterized as a "conditional waiver" of the attorney-client and/or psychotherapist-patient privilege (Evid. Code, §§ 954, 1014) to allow Dr. Benson to testify only to his diagnosis and the information which formed the basis therefor.

The prosecution objected, arguing that it was inconceivable that the witness could have arrived at a diagnosis without considering defendant's statements about the crimes, and that even if the witness were so to testify the prosecution would still be entitled to question him as to the broad range of information available to him which he could, and perhaps ought to, have considered in forming an expert opinion. Thus, the prosecutor argued, any partial waiver of the privilege such as defendant was proposing was illusory,

and would only result in an unfair limitation on the prosecution's right to a full and fair cross-examination. The court agreed, defendant's request was denied, and defendant declined to call Dr. Benson to testify.

 Defendant now argues that the court's ruling was error. He contends that questions about any statements to Dr. Benson other than those on which the witness purportedly based his diagnosis would have been beyond the scope of proper cross-examination of an expert witness as set forth in Evidence Code section 721, subdivision (a),[10] and that calling Dr. Benson to testify would not have amounted to a waiver of the attorney-client privilege as to those statements defendant sought to protect from disclosure.[11]

Defendant's arguments are unpersuasive. Dr. Benson did not testify, and, counsel's assertions notwithstanding, we cannot conclude from the record precisely which of defendant's statements the witness actually referred to in reaching his diagnosis. Similarly, we have only counsel's unsworn assertions to counter the prosecution's reasonable claim that eliciting testimony about Dr. Benson's diagnosis of defendant and the basis therefor would have involved disclosure of a "significant part" of the communication sought to be protected and as such would have constituted a waiver of defendant's attorney-client privilege under Evidence Code section 912, subdivision (a).[12]

If Dr. Benson had testified and had asserted that his opinion was based in no part on statements by defendant about the events surrounding the crimes, the prosecution might have been foreclosed from cross-examining him about such statements. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 503-504 [116 Cal.Rptr. 217, 526 P.2d 225].) The court did not abuse its discretion,

---

[10] Evidence Code section 721, subdivision (a) provides in pertinent part that "a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his qualifications, (2) the subject to which his expert testimony relates, and (3) the matter upon which his opinion is based and the reasons for his opinion."

[11] Defendant does not seek protection here under the psychotherapist-patient privilege (Evid. Code, § 1014), nor would he find any in light of the "client-litigant" exception of Evidence Code section 1016 (no psychotherapist-patient privilege where communication is relevant to patient's mental state and patient has put such state in issue). The attorney-client privilege (Evid. Code, § 954), however, does attach to a defendant's communications to a psychiatrist assisting the defendant's attorney, and this is true whether or not the defendant puts his or her mental state in issue at trial. (*People* v. *Lines* (1975) 13 Cal.3d 500, 514 [119 Cal.Rptr. 225, 531 P.2d 793]; *City & County of S.F.* v. *Superior Court* (1951) 37 Cal.2d 227 [231 P.2d 26, 25 A.L.R.2d 1418].)

[12] Evidence Code section 912, subdivision (a) provides in pertinent part that "the right . . . to claim a privilege provided by Section 954 (lawyer-client privilege) . . . is waived with respect to a communication protected by such privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure . . . ."

however, by refusing to rule on this question in advance of any testimony from the witness.

F. *Alleged Improper Excusal of Prospective Penalty Jurors.*

1. *Challenges for Cause.*

Defendant argues that the excusal of 10 prospective jurors for cause based on their conscientious scruples regarding imposition of the death penalty was improper insofar as the court did not inform them of their civic duty to sit as jurors if they could subordinate their personal beliefs and abide by existing law. He contends that without such a sua sponte admonition the court had no grounds to conclude that the reservations of any individual prospective juror about the death penalty would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].) We have recently rejected precisely this argument in *People* v. *Miranda, supra,* 44 Cal.3d at page 96. Review of the voir dire of the 10 prospective jurors named by defendant reveals no cause for us to doubt that each was properly excused.

2. *Peremptory Challenges.*

Defendant also contends that the prosecution improperly exercised peremptory challenges to exclude 14 prospective jurors who, though not excusable for cause, nonetheless expressed a "lack of enthusiasm" for imposing the death penalty. ▪ There is no constitutional infirmity in permitting peremptory challenges by both sides on the basis of specific juror attitudes on the death penalty. (*People* v. *Turner* (1984) 37 Cal.3d 302, 315 [208 Cal.Rptr. 196, 690 P.2d 669] (plur. opn.); *People* v. *Belmontes* (1988) 45 Cal.3d 744, 799 [248 Cal.Rptr. 126, 755 P.2d 310].)

G. *Failure to Delete Allegedly Irrelevant Factors.*

Defendant argues that the trial court committed reversible error when it denied his request to omit factors (d) and (f) (§ 190.3, factors (d) ["Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance"] and (f) ["Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct"]) from its instructions, as factors not applicable to the case. We have resolved this issue against defendant by our holding in *People* v. *Ghent, supra,* 43 Cal.3d 739, 776-777.

H. *Age, Factor (k) Evidence and Absence of Evidence of Factors in Mitigation as Aggravating.*

The prosecution in closing argument characterized defendant's age at the time of the offenses (defendant was 30) as an aggravating factor.[13] The argument was permissible. (See *People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].)

 The prosecution also argued that some of the evidence introduced by defendant under factor (k) (§ 190.3, factor (k) ["any other circumstance which extenuates the gravity of the crime"]) was aggravating rather than mitigating.[14] Factor (k) is "an open-ended provision permitting the jury to consider any mitigating evidence." (*People* v. *Boyd* (1985) 38 Cal.3d 762, 775 [215 Cal.Rptr. 1, 700 P.2d 782]; *People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813].) In *Boyd, supra,* 38 Cal.3d at page 775, we observed: "The language of factor (k) refers to circumstances which extenuate the gravity of the crime, not to circumstances which enhance it." Accordingly, we held that while the defendant may present evidence relevant to any factor listed in the statute, including factor (k), "the prosecution's case for aggravation is limited to evidence relevant to the listed factors exclusive of factor (k) . . . ." (*Ibid.*) The prosecutor, however, did not overstep that line in arguing that defendant's evidence under factor (k)

---

[13] The prosecution's exact statements were: "Down to the age of the defendant, and that would be either way. I would argue that if we had a very young defendant here, never had any chances in his life, even though this is pretty big trouble to be in, that would be a mitigating factor for sure. [¶] On the other hand, I would submit to you that you have a defendant, certainly old enough to know better, certainly has lived through enough things and had enough experiences and what-not to know the consequences of his actions, certainly has had chances already to screw up and then make good again, and he did a fair job of it for about twenty-six months. [¶] I submit to you that's an aggravating factor here, but again for you to determine."

[14] The prosecutor argued at length that the testimony of the licensed clinical social worker, Lynn Woodward, about the effect defendant's deprived and abusive upbringing should be given little weight due to its selective character. He then stated: "The real tragedy . . . in the defendant's background, the real tragedy is that all these opportunities, that is the opportunity to go to college—If you noticed it on his application somewhere to college, told about how he became aware of minorities funding, stuff like that. He took advantage of it, apparently. And the opportunity to learn to fly in the Marines, things like that. A lot of hard work that goes into that, but definitely a good opportunity. [¶] The real tragedy is all those opportunities that society gives or holds out for a person who is willing to work hard enough for them were wasted. It's almost as big a tragedy for society that the defendant wasted those opportunities as it is that he deprived society of two possibly very useful members of society in killing Mark Hatcher and Mary Booher. [¶] Ladies and gentlemen, is that mitigating? Did he have the opportunity first to go to college and then failed in that, and then to be in the Marines and then failed in that? And then after prison, the training and what-not and job when he got out, and he failed in that. He threw them all away. [¶] Does that make you feel sorry for him? Does that make you feel sorry for society? Does that extenuate the gravity of these crimes? I submit to you, no, it doesn't. It makes it even worse."

did not excuse his conduct—it made it worse. He was merely arguing the lack of weight of defendant's evidence.[15]

## I. *Excessive Multiple-murder Special-circumstance Findings.*

■ As previously mentioned, the guilt phase jury was improperly permitted to find two, rather than one, special circumstances based on multiple murder. It was also error for the penalty jury to consider those findings as two aggravating factors. We have repeatedly held that the consideration of such excessive multiple-murder special-circumstance findings where, as here, the jury knows the number of murders on which they were based, is harmless error. (*People* v. *Kimble, supra,* 44 Cal.3d at p. 504; *People* v. *Allen, supra,* 42 Cal.3d at pp. 1281-1283.)

## J. *Double-counting of Guilt Phase Crimes and Special Circumstances Under Factors (a) and (b).*

■ Defendant argues that the court had a sua sponte duty to instruct the jury that the crimes for which he was convicted during the guilt phase and the special circumstances found to be true were to be considered in aggravation only under factor (a) (§ 190.3, factor (a) ["The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true"]) and not also under factor (b) (§ 190.3, factor (b) ["presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence"]). He points to the fact that the prosecution argued the Booher kidnapping and the Donner-Lucchesi assaults in aggravation under factor (b), thus making it possible that the jury considered them under both factors (a) and (b) and to have given them an improperly inflated aggravating effect.

In *People* v. *Miranda, supra,* 44 Cal.3d 57, we stated that to avoid any possible confusion trial courts in the future should instruct capital sentencing juries that factors (b) (violent criminal activity) and (c) (prior felony convictions) refer to crimes other than those underlying the guilt determination. (*Id.* at p. 106, fn. 28.) We do not believe that the absence of such an instruction here caused any confusion. Although the prosecutor did argue for consideration of the Booher kidnapping and Donner-Lucchesi assaults

---

[15] Defendant argues additionally that the prosecution committed *Davenport* error by arguing "in effect" that the absence of evidence under factors (d) and (f) constituted evidence in aggravation. (*People* v. *Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861].) This argument finds no support in the record, which shows the prosecution argued as to these factors merely that the jury would have to determine whether or not the evidence presented was mitigating.

under factor (b), he did not suggest to the jury that the crimes should be counted twice. Thus, we find no reasonable possibility that the jury was misled.

### K. Consideration of Non-extreme Mental or Emotional Disturbance.

Defendant argues that the court's instructions precluded the jury from considering any mental or emotional disturbance which he might have been suffering at the time of the offenses unless it was "extreme." (See § 190.3, factor (d).) He claims that both Dr. Leifer and Lynn Woodward testified to defendant's tendency to episodes of explosive hostility, and that the jury should have been instructed that they could consider such a condition even if it did not amount to "extreme mental or emotional disturbance" under factor (d).

 We have held that the factor (k) instruction (factor (j) under the 1977 law) to consider " *'any* other circumstance which extenuates the gravity of the crime' [citation], . . . is sufficient to permit the penalty jury to take into account a mental condition of the defendant which, though perhaps not deemed 'extreme,' nonetheless mitigates the seriousness of the offense." (*People* v. *Ghent, supra,* 43 Cal.3d 739, 776.) This is particularly true in this case, where the jury received an expanded factor (k) instruction.[16]

### L. Alleged Ramos Error.

 After the jury received its instructions, one juror asked the court whether the penalty of life imprisonment without the possibility of parole meant "no parole ever? Or, I mean, could he ever come up for parole, as sometimes it happens?" The court answered: "The law provides for life imprisonment without possibility of parole. That's the way the statute reads."

Defendant contends that the court committed reversible error under *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], by not admonishing the jury in response to the above-quoted question "not to speculate about how some future Governor might act" in defendant's case. We disagree.

---

[16] In this pre-*Easley* case (*People* v. *Easley, supra,* 34 Cal.3d 858), the court supplemented the statutory factor (k) language as follows: "Any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, including but not limited to any of the following circumstances: The defendant's childhood, upbringing, education and military accomplishments, conduct while serving prior prison term, participation in community service. And then any other extenuating circumstances relating to his family including his relationship with his children and former wife."

In *Ramos,* this court held that the "Briggs Instruction," informing capital sentencing juries about the Governor's power to commute a sentence of life imprisonment without possibility of parole to one that would include the possibility of parole, violated state constitutional guaranties of due process because of its one-sided reference to the commutation power. (37 Cal.3d at pp. 153-155.) Moreover, we held that even an instruction referring to the Governor's power to commute both a sentence of death and one of life imprisonment without possibility of parole would violate the state Constitution, because it would invite the jury "to consider matters that are both totally speculative and that should not, in any event, influence the jury's determination." (*Id.* at p. 155.)

Defendant is correct that this reasoning, which was based on our decision in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], applies equally to parole as it does to commutation. (See *Ramos, supra,* 37 Cal.3d at pp. 155-156.) However, no instruction was given below which could have misled the jury with regard to defendant's future eligibility for parole or indeed for any other modification of sentence.[17]

Defendant argues that the the trial court was under an obligation to admonish the jurors that, while the Governor can commute any sentence to include the possibility of parole, they were not to consider the possibility of commutation *or* parole in determining the sentence. (*Ramos, supra,* 37 Cal.3d at p. 159, fn. 12.) We find that in the absence of any reference to the commutation power by the jury, however, such an admonition would have been in clear violation of *Ramos.* Rather the court's response was correct, and cannot have left the jury with any doubt that the term "without possibility of parole" meant anything but "without possibility of parole."

M. *Sentencing Discretion.*

██ The court instructed the jury in the language of former CALJIC No. 8.84.2, with certain additions: "I have previously read to you the list of aggravating circumstances which the law permits you to consider, if you find any of them is established by the evidence. These are the only aggravating circumstances that you may consider. [¶] You are not allowed to take account of any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case. [¶] In deciding penalty, the law does not forbid you from being influenced by pity for Mr. Caro. However, the law does forbid you from being governed by mere conjecture, prejudice or public opinion. [¶] In weighing the aggravating and mitigating factors, you are not to merely count numbers on either

---

[17]Though the case was tried prior to *Ramos,* the trial court omitted the Briggs Instruction.

side. You are instructed rather to weigh and consider the factors. One mitigating circumstance or aggravating circumstance may be sufficient to support a decision as to which is the appropriate punishment in this case. [¶] The weight you give to any factor is for you individually to decide. . . . [¶] After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances you shall impose a sentence of confinement in the state prison for life without possibility of parole."

In *People* v. *Brown* (1985) 40 Cal.3d 512, 538-545 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934]), we upheld the 1978 death penalty statute against a challenge that it withdrew constitutionally compelled sentencing discretion from the jury. We observed that "the word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider. . . . By directing that the jury 'shall' impose the death penalty if it finds that aggravating factors 'outweigh' mitigating, the statute should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances." (40 Cal.3d at p. 541.) We acknowledged, however, that the words "shall impose a sentence of death" left room for confusion and stated that each case must be considered on its own merits to determine whether the jury "may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*Id.* at p. 544, fn. 17.)

In this case, we find no reasonable possibility that the jury may have been misled about the scope of its sentencing discretion. The court's supplementation of CALJIC No. 8.84.2 insured that the jury was properly informed of its sentencing discretion and responsibility, and the prosecutor's argument did not divert the jury from this proper understanding. The jury's request, after deliberating eight hours over a two-day period—"May we reconvene at 9:00 a.m. in the courtroom and have the judge repeat his instructions as to the law if we find preponderance of evidence on aggravating or mitigating side"—does not reveal a fundamental misunderstanding of its sentencing

discretion. In our view, it cannot reasonably be interpreted as anything more than a simple request for repetition of the instructions on weighing aggravating and mitigating circumstances.

### N. *Mercy.*

 Defendant argues that the judgment must be reversed because the jury was not instructed that it had "the power to exercise mercy" in its sentencing discretion. The argument fails. The jury was instructed that it could consider sympathy, and counsel did not contradict this instruction. The jury also received an expanded factor (k) instruction, commending to its consideration specific aspects of defendant's character and background as shown by the evidence. Defendant contends that there is a crucial difference between pity, sympathy, and mercy, inasmuch as the first two are sentiments whereas the third implies action. We do not agree, however, that instructions to *consider* various factors, including sympathy for the defendant, could leave a jury with any ambiguity as to its power and duty also to act on such considerations. (*People* v. *Melton, supra,* 44 Cal.3d 713, 760.)

### O. *Motion for Modification of Sentence.*

In its statement of reasons for upholding the death verdict under section 190.4, subdivision (e), the court twice referred to defendant's lack of remorse in connection with the killings.[18] Defendant contends that this indicates the court improperly considered a nonstatutory aggravating factor and that the case should be remanded for a reconsideration of that determination.

In *People* v. *Ghent, supra,* 43 Cal.3d 739, 771 and other recent cases (e.g., *People* v. *Miranda, supra,* 44 Cal.3d at pp. 111-112; *People* v. *Dyer* (1988) 45 Cal.3d 26, 82 [246 Cal.Rptr. 209, 753 P.2d 1]; *People* v. *Odle* (1988) 45 Cal.3d 386, 422 [247 Cal.Rptr. 137, 754 P.2d 184]) we have considered and

---

[18]Specifically, the court made the following findings: "When you go further, you consider the special findings of the jury in connection with the events there shown, it indicates to me that *there has been never been any remorse* that I could see shown by your client, counsel, in connection with this case. At every opportunity, he's sought to escape. First at the time of the arrest, and then the summer when he was here. And the last time during the trial, I believe it was. [¶] The court finds that the jury verdict was the proper verdict under the evidence and the law and I do uphold the jury's findings in this case and direct the clerk to enter upon the minutes that the court finding [*sic*] the aggravating circumstances outweigh the mitigating circumstances[; t]hat the killing of the two teenagers in the Fresno case was unprovoked, was cold blooded murder[; t]hat *the defendant has shown no remorse,* that he intended to kill the two persons involved in the hit-and-run accident, and it was evident that after one man had been shot, the defendant went over and shot him again. It is only a miracle that that man is alive." (Italics added.)

rejected the contention that consideration of a defendant's lack of remorse is error. We adhere to those decisions here.

P. *Constitutionality of the 1978 Statute.*

Defendant contends that the 1978 Briggs death penalty statute violates the Eighth and Fourteenth Amendments to the United States Constitution by its lack of standards to "guide, regularize, and make rationally reviewable the process for imposing a sentence of death." (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 303 [49 L.Ed.2d 944, 960, 96 S.Ct. 2978].) Specifically, he asserts that the statute is deficient for want of the following safeguards: (1) specific and objective enumeration of aggravating and mitigating factors to guide the penalty jury; (2) exclusion of nonstatutory unspecified aggravating factors as a basis for the death penalty; (3) a requirement that the prosecution prove the existence of any aggravating factors beyond a reasonable doubt; (4) a requirement of penalty jury unanimity regarding any aggravating factors found in support of a death sentence; and (5) a requirement that the jury find beyond a reasonable doubt that aggravating circumstances outweigh mitigating and that death is the appropriate penalty. We have previously upheld the statute against challenges on all these grounds. (*People* v. *Howard, supra,* 44 Cal.3d 375, 444; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].)

Q. *Proportionality of Sentence.*

 Defendant contends he should be given proportionality review on both an intracase and intercase basis. We have held in numerous cases that intercase proportionality review is not required. (See, e.g., *People* v. *Allen, supra,* 42 Cal.3d at pp. 1285-1288; *People* v. *Howard, supra,* 44 Cal.3d at pp. 444-445.) As to intracase review under *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], defendant gains no support from that case. The facts of defendant's case bear no similarity to the circumstances in *Dillon,* where an immature 17-year-old defendant, who shot and killed his victim out of fear and panic, was sentenced to life imprisonment despite the view of the judge and jury that the sentence was excessive in relation to his true culpability. (34 Cal.3d at p. 487.) Defendant here committed two senseless and cold-blooded murders of youths who were complete strangers and no threat to him. The situation is in no way comparable to that in *Dillon.*

IV. CONCLUSION

One of the multiple-murder special-circumstance findings is vacated, and the judgment is affirmed in all other respects.

Lucas, C. J., Mosk, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

Broussard, J., concurred in the judgment.

Apellant's petition for a rehearing was denied December 1, 1988, and the opinion was modified to read as printed above.