Filed 10/3/14  P. v. Alvarado CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VICTOR ALPHONSO ALVARADO,<br><br>    Defendant and Appellant. | F066255<br><br>(Super. Ct. Nos. VCF236535 &<br>VCF252005)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Darryl B. Ferguson, Judge.

Robert D. Bacon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Paul A. Bernardino, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found defendant Victor Alvarado guilty of first degree murder (Pen. Code,[1] § 187, subd. (a)) and possession of a firearm by a convicted felon (former § 12021, subd. (a)(1).[2] The jury also found true allegations supporting a gang special circumstance (§ 190.2, subd. (a)(22)) and gang and firearm enhancements (§§ 186.22, subd. (b)(1)(C), and 12022.53, subd. (d).)

At trial, defendant admitted that he shot the victim but testified he did so out of jealous anger, not because he believed the victim was from a rival gang. On appeal, defendant contends that the evidence was insufficient to establish the "primary activities" element of the gang allegations and that the trial abused its discretion by allowing an officer to testify in unreasonable detail about the criminal activity of others. He also challenges the finding of premeditation, arguing the evidence did not show premeditation and the jury instruction on the issue was misleading.

We affirm.

### FACTS AND PROCEDURAL HISTORY

Beginning in 2007, defendant and Jessica Yanez had an "off and on" dating relationship, and had a child together in 2010. In late April 2011, Yanez, who had been living with her mother, began staying at a Motel 6 in Porterville. According to Yanez, she and defendant had been broken up for "some months," but they reconciled while she was staying at the motel.[3] On May 1, 2011, Yanez and defendant drank alcohol in her motel room, and she did not remember much of what happened that night. According to defendant, he left Yanez's motel room that night at about 9:30 p.m.

---

[1]     Subsequent statutory references are to the Penal Code unless otherwise specified.

[2]     Section 12021, subdivision (a)(1), has since been recodified as section 29800.

[3]     Defendant similarly testified that they broke up in February 2011 and got back together right before May 2011.

2.

Kayla Cantu was Yanez's friend. She was "on the run from [her] probation officer" and was staying with Yanez in her motel room. Cantu testified that she associated with Northerners and would never hang out with Southerners.[4] She was dating Leo Alvarado, and they spent a lot of time together.[5] Late in the evening of May 1, 2011, Leo and his friend Edgar Arias went to hang out in Yanez's motel room. Leo was wearing a white shirt and a red hat with a "C" on it for the Cincinnati Reds. Arias was wearing a black and silver Angels hat. After the young men arrived, Cantu and Yanez smoked marijuana. At that point, Leo, Arias, Cantu, and Yanez were in the motel room.

Soon after Leo and Arias arrived, Arias heard whispering and a low-toned voice outside. Arias opened the motel room door to see who was talking and Yanez and defendant seemed to be having a normal conversation. About a minute or two later, defendant appeared at the doorway.

Defendant stepped in the doorway of the motel room and looked around. Arias testified that defendant asked, "Oh, you guys gangsters or something?" and "Are you guys busters?" Arias remembered that defendant said, "Que paso, besse?" and then asked them in English if they bang. According to Cantu, defendant said "What the fuck, Jessica?" or "Jessica" to Yanez and did not say anything else. Cantu also testified that defendant was mumbling and she did not understand. Defendant looked around, then looked directly at Leo, and shot him. Arias thought defendant stood at the doorway for "[m]aybe a minute" before he started shooting. Arias heard two shots. He was afraid that defendant was going to shoot him, so he crouched down. When Arias looked up,

---

**4** A gang expert testified that Northerners and Southerners are rival gangs.

**5** Because Leo Alvarado shares the last name of defendant, we will refer to him as Leo to avoid confusion. No disrespect is intended. Cantu testified that Leo had hung out in the motel room with her four or five times before May 1, 2011.

defendant was gone.  He saw Yanez and Cantu run out of the room.  Arias shut and locked the motel room door and called 911.  Arias had never met Cantu or Yanez before that night, and he did not know defendant.

Porterville police officer Mark Lightfoot was dispatched to the Motel 6 at 12:11 a.m. on May 2, 2011.  In Yanez's room, Lightfoot found Leo's body lying on the floor just inside the doorway at the foot of a bed.  Leo did not have a pulse.  He died from a single gunshot wound to the head.  The entry wound was near his nose;  the powder stippling around the wound indicated that he had been shot from a distance of two to ten feet.  The bullet lodged in his spinal canal and was recovered during an autopsy.

Defendant was identified as a suspect.  The police already had his cell phone number from a previous criminal investigation and were able to track defendant's location based on information from his carrier.  He was arrested near his residence without incident.  After the arrest, police officers reviewed the text messages on defendant's cell phone.  They found texts between defendant and someone identified as "Rascal."  Sergeant Brian Nix knew that Jose Astorga went by the moniker or nickname "Rascal."[6]  Astorga also happened to be staying with his aunt and cousins at the same Motel 6 in Porterville.

It appeared to the officers from the text messages that defendant and Astorga were trying to make arrangements to pick up a gun.  At 11:17 p.m. on the night of the shooting, defendant sent a text message to Astorga asking where he was.  Astorga responded that he was at Motel 6 and defendant should be on the look out if he comes.  At 11:22 p.m., Astorga texted to defendant, "Ur gona want the slut?"  An officer testified that "slut" referred to a gun.  At 11:44 p.m., defendant responded, "Yea wer u at."  Around

---

**6**      Astorga was a Southern gang member in a subset called Campo Loco.  At trial, Astorga was called as a witness, and the jury learned that he was involved in a separate gang-related murder case and another gang-related attempted murder case.  In both cases, he entered pleas.

6:50 a.m. on May 2, 2011, defendant sent Astorga texts asking what was going on and whether there were police or ambulance at the motel. At 7:00 a.m., defendant texted, "Orale hey ese I drop dat shit." Later, defendant texted, "Well I want 2 pick dat shit up it's rite there wer ur at in da water." Astorga texted that he would get it, but subsequently texted that he "didnt find it."

Based on the text messages, police officer Robert Meier was able to determine the area where defendant left the gun after the shooting. Meier found a semiautomatic handgun in an inch of water in a slough at Indiana Street near the motel.[7] There was a live round in the chamber and two live rounds in the magazine of the handgun.

Meier also processed the crime scene. In the motel room, he found a Cincinnati Reds baseball cap, alcohol containers, and a .25 auto caliber shell casing. Meier observed a bullet hole in the wall and recovered the bullet. The alcohol containers were collected for fingerprint testing, and prints taken from the containers matched defendant, Yanez, and Leo. A forensic firearms examiner later concluded that the bullet found in Leo's body and the bullet taken from the motel room wall were fired from the handgun Meier found in the water.

Police officer Vincent Buck participated in a search of defendant's house and found evidence of gang involvement. The front door of defendant's bedroom had the number 13 in metal numbers. There were CD's of gang-related music and movies, and the clothing in the room was mostly blue, white, or black. Buck found a black baseball hat with "TC" on the front[8] and a wooden box with Southern gang symbols. He also

---

[7]    Defendant's text indicated the gun ("dat shit") was in the water near where Astorga was staying ("rite there wer ur at"). Meier explained there was a slough that ran behind the Motel 6. Meier walked down to the slough and then walked a path he thought defendant would have taken to get away and looked in areas defendant could have left the gun so that it could be found later (e.g., not in deep water).

[8]    Buck testified that the "TC" hat identifies the wearer as a gang member from Tulare County.

found a letter addressed to defendant from Jose Gonzalez. Jose Gonzalez and his brother Rafael Gonzalez[9] were Southern gang members. The letter from Jose included photocopies of police reports Buck had written for a homicide investigation in which Jose and Rafael were suspects. The photocopied reports had been redacted, i.e., the identifying information about victims and witnesses had been removed. Above the redacted areas, however, the names of the witnesses were handwritten in pencil. At the time Buck searched defendant's house, Jose and Rafael Gonzalez were waiting for trial in the homicide case. They later entered pleas. We will sometimes refer to this case as the Gonzalez brothers' homicide case.

On December 20, 2011, the Tulare County District Attorney filed a two-count information against defendant, charging him with murder (§ 187, subd. (a); count 1) and possession of a firearm by a felon (former § 12021, subd. (a)(1); count 2). With respect to count 1, the district attorney further alleged (1) defendant intentionally killed Leo Alvarado while defendant was an active participant in a criminal street gang and the murder was carried out to further the activities of the criminal street gang (§ 190.2, subd. (a)(22)), (2) defendant personally and intentionally used and discharged a firearm causing death (§ 12022.53, subds. (b), (c), and (d)), and (3) the offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).

A jury trial began on September 18, 2012.

Police officer Joe Echevarria, who worked in the gang unit and had 16 years' law enforcement experience, testified as a gang expert. As part of the gang unit, he participated in searches of gang members' houses, made contact with gang members, and investigated crimes in which gang members were suspects. He was familiar with the Southern gang in Porterville. There were about 150-200 Southerners in Porterville and

---

[9] There are are four Gonzalez brothers—Jose, Rafael, Juan, and Norberto. We sometimes refer to them by their first names only for the sake of brevity.

6.

approximately 1,500 in Tulare County. Southerners identify with the color blue and the numbers 13 and 3. Their rivals are the Northerners, who are associated with the color red and the numbers 14 and 4. Among Southerners, there are many subsets or cliques. In Porterville, some of the Southern cliques are the Wicked Side Varrio or WSV, Campo Loco or CL, and Brown Pride Sureños. Members of the different cliques join together to commit crime. Echevarria testified that the primary activities of the Southern gang in Porterville include homicide, assaults, batteries, burglaries, drug sales, gun possession, gun sales, carjackings, extortion, witness intimidation, and vandalism.

Echevarria described two predicate offenses committed by Southerners. First, in September 2008, Eddie Villegas, a Southern gang member, threatened victims with bricks. In that case, Villegas was convicted of vandalism, and he admitted a gang allegation. Second, in September 2007, Juan Gonzalez,[10] a Southern gang member, was involved in a drive-by shooting. Defendant was in the car with Juan at the time. They pulled up next to a Northern gang member, and Juan fired a few rounds, hitting the victim in the hand. Juan Gonzalez entered a plea and admitted a gang allegation.

Echevarria was familiar with defendant from prior police contacts. In addition, he spoke to other police officers about defendant and reviewed police records and law enforcement records from other agencies regarding defendant. Based on this information, Echevarria opined that defendant was an active Southern gang member.

Buck also testified as a gang expert. He explained that the Cincinnati Reds cap worn by the shooting victim, Leo, identified him as a member of VCP, Varrio Centro Porros, a Northern clique found in central Porterville. Buck further explained that if a nongang member were to wear a Reds hat in Porterville, he would be "hit up" by gang members, meaning they would ask the person why he is wearing the hat. In 2007, Leo

---

**10**    Juan is a brother of Jose Gonzalez, whose letter to defendant containing redacted police reports in the Gonzalez brothers' homicide case was found in a search of defendant's house.

admitted to the police that he was a Northerner. At that time, he was in a truck with three others, all of whom also admitted to being Northerners. One of them was a high ranking member of VCP. Buck explained that "buster" is a derogatory term for a Northerner and the term is used primarily by Southern gang members.

Defendant has three brothers. Buck was familiar with them and testified they were all gang members. In 2006, Buck investigated a gang-related attempted murder in which defendant's family was targeted. In that case, two Northern gang members drove by defendant's house and shot at it. Defendant's home had been targeted at two different locations. In a more recent incident, defendant's mother was shot, and the family moved shortly thereafter in February 2011.

Buck testified about photographs of defendant with other known gang members.[11] The first photograph showed defendant between Jose and Rafael Gonzalez. A second photograph showed Jose Gonzalez, defendant, Juan Gonzalez, defendant's younger brother Santiago Alvarado, and Rafael Gonzalez. In this photo, Jose held his finger up for the number one, defendant was wearing his shirt with only the top three buttons buttoned, an identifier of Southerners, Juan was wearing a blue bandanna and holding a weapon, Santiago was forming the letters "C" and "L" for Campo Loco with his fingers, and Rafael was holding his fingers to form the number three, which together with Jose formed the number 13. Buck explained that defendant, Juan Gonzalez, and Rafael Gonzalez claimed the clique Wicked Side Varrio, Santiago Alvarado claimed Campo Loco, and Jose Gonzalez represented the clique East Side Trece, but they all were Southerner gang members.

A third photograph depicted brothers Rafael and Norberto Gonzalez with defendant and his brothers Francisco and Santiago Alvarado. They all wore T-shirts that

---

[11]     Buck found the photographs during a search conducted during his investigation of the Gonzalez brothers' homicide case.

read "In memory of Eduardo Luna, AKA Luny's." Eduardo was the youngest brother of the Luna family. His two older brothers were Southern gang members, and the Luna family lived on "G" Street in Porterville. Buck testified that in 2006, the Northerners were trying to do a "move out" of the older Luna brothers. Buck explained that a "move out" is "where gang members continuously shoot or vandalize or disrupt somebody's house in an effort to [get them to] move out of their area so they can show dominance or control of that area." Eduardo Luna was shot by a VCP gang member because his brothers would not move out of the neighborhood. Buck testified that after Eduardo's death, the Gonzalez brothers and defendant and his brothers formed the clique Wicked Side Varrio.

Buck was presented the hypothetical situation that a Southern gang member shows up at a motel room and sees his girlfriend, who is also the mother of his baby, and another girl with two men, one of whom is wearing a Cincinnati Reds hat, and the Southern gang member shoots the man in the Reds hat. Buck gave his opinion that the shooting would be committed for the benefit of the gang. He explained that the Southern gang member would perceive a person wearing a Cincinnati Reds hat in the same room with his girlfriend as disrespectful. The Southern gang member would be expected to respond to that disrespect. In addition, the shooting would elevate the Southern gang member's status because he "is taking out a rival gang member."

Defendant testified on his own behalf. He testified that he not did know Leo or Arias. Defendant went to Yanez's motel room around 7:00 p.m. on May 1, 2011. He testified that he already had a gun when he went to visit Yanez. He explained that he had a gun, "Because prior to going there, I had got robbed from my paycheck." Cantu and Yanez were in the room, and defendant started drinking with Yanez. Around 9:00 or 9:30 p.m., defendant and Yanez argued. They were both drunk, and defendant could not recall what they argued about. He left the room and started walking. Then he texted with

9.

his friend Astorga. About 10:00 p.m., defendant realized Astorga was staying at the Motel 6 and went to Astorga's room. They hung out in Astorga's room for a while.

Defendant "cooled off" and decided to apologize to Yanez. He walked toward Yanez's motel room and saw her come out of the room. Defendant and Yanez were outside and defendant was trying to apologize when he saw a person's head stick out of Yanez's motel room. Defendant thought "it was a guy's head." He became angry and believed Yanez was cheating on him. He screamed at Yanez and said, "What the fuck?" and then went to the motel room and started banging on the door. Defendant testified, "When this guy opens the door, I just lose it. I get mad and angry and just shoot him." He did not remember saying "Que paso, besse?" and denied saying anything to the young men in the motel room. He testified that he stood at the doorway for five seconds before he shot Leo. He did not pay attention to what Leo was wearing. He did not see Arias or Cantu in the room. Then defendant took off running. He did not realize he dropped the gun.

Defendant testified that he was not a Southerner, he "just talked to [S]outherners." On cross-examination, defendant agreed that Northerners were his enemies and stated that he had been a Southerner for five years. (He was 20 years old at the time of the shooting.) Later in cross-examination, defendant reiterated that he associated with Southerners but he was not a gang member. He testified that he did not know what Northerners wear and that a Cincinnati Reds hat can mean "[w]hat they want."

Defendant denied he texted with Astorga about a gun. He testified that he thought "slut" (in Astorga's text "Ur gona want the slut?") referred to a girl. On cross-examination, he was asked whether "picking that shit up" referred to a gun, and he responded that he did not remember.

On September 21, 2012, the jury found defendant guilty of both counts and found true all special allegations.

10.

The sentencing hearing took place on October 18, 2012. For count 1, the court imposed a term of life without the possibility of parole plus 40 years to life for the enhancements. For count 2, the court imposed the middle term of two years to be served concurrently.

Defendant filed a notice of appeal on November 26, 2012.

## *DISCUSSION*

### I.      *Sufficiency of evidence on the gang's primary activities*

Under section 190.2, subdivision (a)(22), a defendant found guilty of first degree murder is subject to the death penalty or life imprisonment without the possibility of parole if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

A "'criminal street gang'" is defined in section 186.22, subdivision (f), as "any ongoing organization, association, or group of three or more persons, whether formal or informal, *having as one of its primary activities the commission of one or more of the criminal acts enumerated* …, having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Italics added.) The enumerated criminal acts listed in subdivision (e) of section 186.22 include assault with a deadly weapon, homicide or manslaughter, sale of controlled substances, shooting at an inhabited dwelling or occupied motor vehicle, shooting from a motor vehicle, intimidation of witnesses, grand theft, burglary, felony extortion, felony vandalism, carjacking, sale and possession of firearms, and car theft. (§ 186.22, subd. (e)(1), (3)-(6), (8), (9), (11), (19)-(23), (25).)

In this case, the jury found true the gang-related special circumstance and enhancement allegations. Defendant contends that the evidence was insufficient to

11.

establish the "primary activities" element of the special circumstance and enhancement. We disagree.

In deciding a challenge to the sufficiency of the evidence, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. (*Ibid*.)

In *People v. Gardeley* (1996) 14 Cal.4th 605, 617, 620 (*Gardeley*), a gang expert testified that the primary activity of the Family Crip gang was the sale of narcotics and the gang also engaged in witness intimidation. The expert's testimony was based on his conversations with gang members, personal investigation of crimes committed by gang members and information from his colleagues and various law enforcement agencies. (*Ibid*.) Our Supreme Court concluded the expert's testimony was sufficient for the jury to find that the Family Crip was a criminal street gang, including the element that one of its primary activities was the commission of one or more of the crimes enumerated in section 186.22, subdivision (e). (*Gardeley*, *supra*, at p. 620.)

Here, Echevarria was asked what the primary activities of Southern gangs in Porterville were. He replied, "Ranges from homicide, assaults, batteries, burglaries, drug sales, gun possession, gun … [s]ales, carjackings, car thefts, grand theft, extortion, victim witness intimidation, vandalism. To name a few." Echevarria's expert opinion, like the expert's opinion in *Gardeley*, was based on his own contacts with defendant and other gang members, investigations of crimes committed by gang members, and information from police officers and other law enforcement agencies. Accordingly, Echevarria's testimony was sufficient evidence to support a finding that the identified crimes were one of the primary activities of the Southerners.

12.

Defendant argues this case is similar to *In re Alexander L.* (2007) 149 Cal.App.4th 605, 614 (*Alexander L.*) in which the court concluded there was insufficient evidence to support a finding that the gang at issue, Varrio Viejo, was a criminal street gang for purposes of section 186.22. We are not persuaded.

In *Alexander L.*, the gang expert's testimony was as follows:

> "At trial, Lang testified as a gang expert. He testified generally about the benefits graffiti might create for a gang, such as intimidating rivals. He also stated his opinion that Varrio Viejo was an active street gang as of the date of [the defendant's] arrest. When asked about the primary activities of the gang, he replied: 'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' No further questions were asked about the gang's primary activities on direct or redirect examination." (*Alexander L.*, *supra*, 149 Cal.App.4th at p. 611.)

The Court of Appeal concluded the gang expert's testimony was inadequate, explaining: "Lang's entire testimony on this point is quoted above—he 'kn[e]w' that the gang had been involved in certain crimes. No specifics were elicited as to the circumstances of these crimes, or where, when, or how Lang had obtained the information. He did not directly testify that criminal activities constituted Varrio Viejo's primary activities. Indeed, on cross-examination, Lang testified that the vast majority of cases connected to Varrio Viejo that he had run across were graffiti related." (*Alexander L.*, *supra*, 149 Cal.App.4th at pp. 611-612, fn. omitted.)

The court continued: "Even if we could reasonably infer that Lang meant that the primary activities of the gang were the crimes to which he referred, his testimony lacked an adequate foundation.… [¶] We cannot know whether the basis of Lang's testimony on this point was reliable, because information establishing reliability was never elicited from him at trial. It is impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay. [Citation.] Lang's conclusory testimony

13.

cannot be considered substantial evidence as to the nature of the gang's primary activities." (*Alexander L.*, *supra*, 149 Cal.App.4th at p. 612, fns. omitted.)

We conclude the gang experts' testimony in the present case is distinguishable from—and far more substantial than—the testimony in *Alexander L.* First, the *Alexander L.* court determined that the gang expert did not directly testify that criminal activities constituted Varrio Viejo's primary activities. (*Alexander L.*, *supra*, 149 Cal.App.4th at pp. 611-612.) Here, Echevarria identified various crimes as the Southerners' primary activities.

Second, in *Alexander L.*, the gang expert testified that the vast majority of cases connected to Varrio Viejo that he had run across were related to graffiti. In the present case, there was no similar testimony that the vast majority of cases involving Southerners were minor or did not involve crimes enumerated in section 186.22, subdivision (e). Instead, considering Echevarria's testimony together with Buck's and Astorga's testimony, the jury learned that Southern gang members threatened victims with bricks (Villegas) , committed a drive-by shooting (Juan Gonzalez), and were involved in murders (Gonzalez brothers, Astorga) and an attempted murder (Astorga).

Third and perhaps most important, in *Alexander L.*, there was no evidence on how the gang expert obtained his information. Here, in contrast, there was evidence of the basis for Echevarria's opinion. He had served in the gang unit and had 16 years' law enforcement experience, and he testified that he had prior personal contacts with defendant and other gang members, he had investigated crimes committed by gang members, and he obtained information from other police officers and other law enforcement agencies. For these reasons, defendant's reliance on *Alexander L.* is unavailing.

Defendant next asserts: "A judgment concerning what is and is not a primary activity cannot be based on an assessment of the group's criminal activities alone. It demands familiarity with all the group's activities, criminal and otherwise, so that the

14.

number and nature of the enumerated crimes committed by its members on its behalf can be assessed in context." Defendant cites no authority for the proposition that there must be evidence of a gang's noncriminal activities in order to assess whether its criminal activities are one of its primary activities. To the contrary, the authority cited by defendant supports our conclusion that the expert testimony in this case was sufficient to establish that commission of the crimes identified by Echevarria was among the Southern gang's primary activities.

Defendant cites *People v. Sengpadychith* (2001) 26 Cal.4th 316, 323-324 (*Sengpadychith*), in which the California Supreme Court considered the "primary activities" element of section 186.22, subdivision (f). In that case, the court observed that evidence of past commission of an enumerated crime by gang members by itself may not necessarily be sufficient to establish the primary activities of the gang. The court explained: "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes be one of the group's 'chief' or 'principal' occupations. (See Webster's Internat. Dict. (2d ed. 1942) p. 1963 [defining 'primary'].) That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*Sengpadychith*, *supra*, at p. 323.)

The *Sengpadychith* court recognized that sufficient proof of a group's primary activities could consist of expert testimony, such as the gang expert testimony in *Gardeley*, *supra*, 14 Cal.4th 605. (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324.) The court, however, did *not* require an assessment of "all the group's activities, criminal and otherwise" as advocated by defendant. Likewise, in *Gardeley*, the court did not require consideration of all of the Family Crip's activities in order to assess whether sale of narcotics or witness intimidation were among its primary activities. (Cf. *Gardeley*, *supra*, at p. 620.) Nor was there any mention that the gang expert in *Gardeley* considered the Family Crip's noncriminal activities before opining that sale of narcotics was the Family Crip gang's primary activity. (See *id*. at pp. 611-614 [describing gang expert's

15.

testimony].)  In sum, the *Sengpadychith* court endorsed the gang expert testimony in *Gardeley* and did not suggest that satisfaction of the "primary activities" element of section 186.22 requires consideration of *all* the alleged gang's activities.

Here, as we have discussed, Echevarria's testimony is similar to the expert testimony in *Gardeley*.  As a result, *Sengpadychith* supports our conclusion that there was sufficient evidence to establish that commission of the crimes identified by Echevarria were "one of [the] primary activities" of the Southern gang.  (§ 186.22, subd. (f).)

## II.    *Buck's testimony regarding criminal activity of others*

Defendant also contends the trial court abused its discretion by allowing Buck to testify about the criminal activity of others.  We find no abuse of discretion.

### A.    *Background*

In a pretrial motion, defendant argued that references to his putative gang membership were inadmissible.  He argued that the gang expert's opinion testimony should be excluded because, among other things, under Evidence Code section 352, its slight probative value was outweighed by the probable prejudicial effect.  The trial court ruled that it would allow the gang expert's testimony, but stated, "If something should come up during his testimony, I guess, that I'm not aware of, we'll deal with that then."

At trial, Buck testified that defendant's brothers were Southern gang members.  Defense counsel objected to this testimony on the ground of lack of foundation.  The trial court overruled the objection with the understanding that Buck would be able to lay a foundation.  Buck then explained that he was familiar with defendant's brothers and knew they were gang members based on previous contacts, admissions of gang membership made to Buck, and police reports.

In describing the formation of the Wicked Side Varrio clique, Buck testified: "After [Eduardo Luna's] death, you can see a huge increase in violent criminal activity between the Gonzalez brothers, the Alvarado brothers, and rival [N]ortherners."  Defense

16.

counsel raised an objection based on lack of foundation and the trial court overruled the objection.

Buck continued: "The Gonzalez brothers and the Alvarado brothers were continuously involved in violent confrontation with rival [N]orthern gang members where one group of brothers would be involved in a crime or together, and they would shuffle weapons back and forth amongst their houses when they were involved in these crimes. [¶] … [¶] For the most part, that was the beginning of what they call Wicked Side Varrio, WSV. It was this initial core group other than Santiago and others that lived on G Street [where the Luna brothers lived] that developed or established WSV."

Buck testified that WSV did not recruit people at the time of trial. He explained: "Basically, the [clique] has been pretty much fragmented ever since then. Several of the individuals were arrested during the course of the Gonzalez homicide investigation. And that's pretty much a result of it. They're in custody."

### B.    Analysis

"Evidence Code section 352 gives the trial court discretion to determine if otherwise relevant evidence should be excluded because its probative value is substantially outweighed by its prejudicial effect or if the evidence is cumulative. We review for an abuse of discretion while giving the trial court's determination deference. [Citation.] For Evidence Code section 352 purposes, prejudice refers to evidence that uniquely tends to evoke an emotional bias against the defendant without regard to its relevance on material issues. [Citation.]" (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 650 (*Killebrew*), fn. omitted, disapproved on another ground in *People v. Vang* (2011) 52 Cal.4th 1038, 1047-1048, fn. 3.)

As a "general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative[,] and is not cumulative. [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.) "Gang evidence is relevant and admissible

17.

when the very reason for the underlying crime, that is the motive, is gang related. [Citation.] "'[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]'" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1168.)

Here, Buck's testimony about how the Northerners' "move out" campaign aimed at the Luna brothers resulted in the formation of Wicked Side Varrio was relevant to establish that defendant was an active gang member of a clique of the Southerners and to establish the bitter rivalry between WSV and the Northerners. The details regarding different cliques committing crimes together was relevant to show that defendant, a member of the WSV clique of the Southerners, would have worked together with Astorga, a member of a different clique of the Southerners, in obtaining and then retrieving a handgun. The evidence that defendant's fellow WSV gang members committed violent crimes aimed at Northern gang members was relevant to support the prosecution's theory that defendant was motivated to shoot Leo because defendant perceived him to be a rival gang member and not simply because Leo was in a motel room with defendant's sometime girlfriend. Further, in light of defendant's claim that he was not a Southern gang member and did not know what Northerners wear, Buck's testimony was relevant to impeach defendant's testimony. Under these circumstances, we cannot say the admission of Buck's testimony in this case exceeded the bounds of reason. (See *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 ["'[A]dmission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason.'"].)

Defendant, however, argues that Buck's testimony is akin to the gang expert's testimony this court found objectionable in *Killebrew*, *supra*, 103 Cal.App.4th 644. We disagree.

In *Killebrew*, police officers observed young Black men riding in three cars in East Side Crip territory after midnight. The police conducted a traffic stop of one of the cars, a Chevrolet. They found a handgun in the car, and the four occupants of the Chevrolet were arrested. The other two cars were located nearby at a taco stand. Seven young Black men were identified as the occupants of the two cars, and a handgun was found hidden in a shoebox near the taco stand. These seven men were arrested. (*Killebrew*, *supra*, 103 Cal.App.4th at pp. 648-649.) The defendant Killebrew was not found in the Chevrolet or at the taco stand. Rather, he was seen watching the traffic stop of the Chevrolet from a street corner. (*Ibid.*) The prosecution theorized that the occupants of the three cars had conspired to possess the handgun found in the Chevrolet and the handgun found at the taco stand. The prosecution further argued that Killebrew had been a passenger in one of two cars found near the taco stand and, therefore, he also participated in the conspiracy. (*Id.* at p. 649.)

At trial, a gang expert gave his opinion that all twelve men arrested that night were members of the East Side Crips. (*Killebrew*, *supra*, 103 Cal.App.4th at p. 659.) The gang expert "then spent over 100 pages of transcript explaining in detail why he believed each man was a gang member. This testimony varied from convictions, to arrests without convictions, to pure speculation." (*Ibid.*) The *Killebrew* court was particularly troubled by the expert's testimony regarding a juvenile, T.D., who was an occupant of the Chevrolet. "[The gang expert] testified (1) T.D. was with other gang members near where a man was killed, (2) T.D. was accused of shooting at two people, (3) T.D. was suspected of involvement in a gun battle with two rival gang members shortly before he was arrested for possession of a handgun and possession of marijuana, and (4) T.D. was accused of robbing a store with three other gang members. There was no evidence that T.D. was arrested, tried or convicted (or the allegations of juvenile petitions found true) for any of these accusations." (*Ibid.*)

19.

The court found the trial court abused its discretion by allowing so much testimony that appeared to lack evidentiary basis: "It is disturbing that the trial court allowed [the gang expert] to offer this testimony on direct examination despite repeated objections. The law in California is well settled: An expert may not testify to incompetent hearsay under the guise of stating reasons for an opinion. [Citations.] [The gang expert's] testimony was clearly incompetent hearsay that should neither have been elicited nor admitted. Moreover, the trial court is obligated by Evidence Code section 352 "'to weigh the probative value of inadmissible evidence relied upon by an expert witness … against the risk that the jury might improperly consider it as independent proof of the facts recited therein."' [Citation.] The trial court abused its discretion by allowing [the gang expert] to testify at such great length about material that inflamed the jury's passions and had little or no probative value." (*Killebrew*, *supra*, 103 Cal.App.4th at p. 659.)

Buck's testimony in the current case is not akin to gang expert's testimony in *Killebrew*. It does not appear that Buck's testimony was based on incompetent hearsay since he testified that he was familiar with defendant and his family from personal criminal investigations. He knew the Gonzalez brothers and personally investigated the Gonzalez brothers' homicide case. In addition, he testified that Jose and Rafael were charged with murder and later entered pleas. Echevarria testified that Juan Gonzalez committed a drive-by shooting against a rival Northerner and entered a plea. Buck testified that most of the members of the WSV clique were in custody. Thus, Buck's testimony was not based on "arrests without convictions … [or] pure speculation" as in *Killebrew*. (*Killebrew*, *supra*, 103 Cal.App.4th at p. 659.)

Instead, Buck's testimony is more like the background gang information that was found to be permissible in *Killebrew*. As we have described, the prosecution's theory in *Killebrew* was that all twelve men conspired to possess the handguns found in the Chevrolet and near the taco stand. This theory was premised on the effect an earlier

20.

gang-related shooting would have had on members of the East Side Crips. (*Killebrew*, *supra*, 103 Cal.App.4th at p. 650.) This shooting occurred in the early evening the day before the traffic stop and mass arrest. At a park, members of the Country Boy Crips criminal gang, along with many women and children, attended a gathering to honor a friend who had died. A black Jeep drove by the park, and gunfire erupted from the Jeep. At least two people at the park were killed. The shooters identified themselves as members of the East Side Crips. (*Id*. at p. 647.) At Killebrew's trial, the court allowed extensive testimony about the events at the park. (*Id*. at p. 650.)

The prosecution argued that the park shooting was a major gang event guaranteed to generate retaliation by the Country Boy Crips. "The prospect of retaliation was the basis for the actions taken by the officers that night as well as the foundation of the prosecution's conspiracy theory." (*Killebrew*, *supra*, 103 Cal.App.4th at p. 650.) The appellate court rejected Killebrew's argument that the trial court erred by allowing such extensive testimony on the park shooting. The court found that the evidence of the park shooting was relevant because it provided support for the prosecution's theory of the case. The court acknowledged that evidence that Killebrew was an East Side Crip and that the East Side Crips were responsible for at least two deaths "undoubtedly evoked the kind of emotional bias that Evidence Code section 352 is designed to preclude from the courtroom." (*Ibid*.) Nonetheless, it concluded that the trial court did not abuse its discretion by allowing the extensive testimony about the park shooting given its relevance.

In a similar vein, Buck's testimony about the formation of the WSV clique and the violence between the clique and rival Northerners was relevant to support the prosecution's theory in this case. The testimony supported the theory that defendant shot Leo because he was wearing a hat that signified he was a member of the rival clique that was responsible for the death of Eduardo Luna.

21.

Defendant's reliance on *People v. Albarran*, *supra*, 149 Cal.App.4th 214 is misplaced. In that case, the Court of Appeal found that the prosecution failed to present sufficient evidence that the crimes were gang motivated and, as a result, the gang evidence presented at trial was irrelevant. (*Id*. at p. 217.) The court specifically found that the gang evidence was not relevant to the issue of motive and intent, noting that "the motive for the underlying crimes … was not apparent from the circumstances of the crime." (*Id*. at p. 227.) The court went on to conclude that the admission of the irrelevant gang evidence was prejudicial. (*Id*. at pp. 228-232.)

Here, in contrast, there *was* evidence of gang motive from the circumstances of the crime. According to Arias, defendant used a derogatory term for Northerners in addressing Leo and Arias and then, after looking at the two men, chose to shoot Leo, who was wearing a Cincinnati Reds hat. Buck testified that wearing a Cincinnati hat in Porterville signifies that the person is a member of VCP, a Northern clique. Thus, unlike *People v. Albarran*, the possible gang motive was apparent from the circumstances of the crime. As we already have concluded, Buck's testimony was relevant to support the prosecution's theory that defendant shot Leo because he perceived Leo to be a member of a rival gang.

### III. *Sufficency of evidence of premeditation*

The jury found defendant guilty of first degree murder. Defendant contends the evidence did not show a premeditated killing as defined by section 189. This contention lacks merit.

Section 189 provides in relevant part: "All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under

Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree."

The statute further provides, "To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (§ 189.)

In *People v. Mayfield* (1997) 14 Cal.4th 668, 767 (*Mayfield*), the California Supreme Court explained: "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' [Citation.]"

Defendant argues the rule of *esjudem generis* supports his position that there was insufficient evidence of premeditation in this case. "The canon of *ejusdem generis* ' … means that if a statute contains a list of specified items followed by more general words, the general words are limited to those items that are similar to those specifically listed.' [Citation.]" (*Sterling Park, L.P. v. City of Palo Alto* (2013) 57 Cal.4th 1193, 1202.) In *People v. Thomas* (1945) 25 Cal.2d 880, 899-900 (*Thomas*), the California Supreme Court applied this canon of construction to section 189. "[T]he more general words 'or any other kind of willful, deliberate, and premeditated killing,' following the specifically enumerated instances of killing which are expressly declared to constitute murder of the first degree, must be construed in the light of such specifically listed types and be held to include only killings of the same general kind or character as those specifically mentioned. By conjoining the words 'willful, deliberate, and premeditated' in its definition and limitation of the character of killings falling within murder of the first degree the Legislature apparently emphasized its intention to require as an element of

23.

such crime substantially more reflection than may be involved in the mere formation of a specific intent to kill." (*Thomas*, *supra*, at pp. 899-900.)

Relying on the rule of *esjudem generis*, defendant asserts, "Nothing in this record is of a piece with poisoning, murder by explosives, and the other statutory examples of premeditated killings, so the present offense is not within the scope of section 189. By all accounts it was a matter of seconds from the time [defendant] became aware that there was a man or men in [Yanez's] room until he fired." Defendant's argument seems to imply that a premeditated killing must take as much as time, or require as much planning, as a killing achieved by poisoning or explosives, but this is not the law. To the contrary, the *Thomas* court observed, "[A] murder is of the first degree no matter how quickly the act of killing follows the ultimate formation of the intention if that intention has been reached with deliberation and premeditation." (*Thomas*, *supra*, 25 Cal.2d at p. 900.)

The *Thomas* court continued: "'The intent to kill must be the result of deliberate premeditation; it must be formed upon a pre-existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation.' Neither the statute nor the court undertakes to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated. The time would vary with different individuals and under differing circumstances. The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides (not specifically enumerated in the statute) which are the result of mere unconsidered or rash impulse hastily executed. [¶] The word 'deliberate' is an antonym of 'Hasty, impetuous, rash, impulsive' (Webster's New Int. Dict. (2d ed.)) and no act or intent can truly be said to be 'premeditated' unless it has been the subject of actual deliberation or forethought (*id.*)." (*Thomas*, *supra*, 25 Cal.2d at pp. 900-901.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, the California Supreme Court "surveyed a number of prior cases involving the sufficiency of the evidence to support findings of premeditation and deliberation" and identified three categories of evidence generally relevant to the determination: (1) motive, (2) planning activity, and (3) manner of killing. (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 [analyzing *People v. Anderson*].). "These factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation. [Citation.] However, '[w]hen the record discloses evidence in all three categories, the verdict generally will be sustained.' [Citation.] In conducting this analysis, we draw all reasonable inferences necessary to support the judgment. [Citation.]" (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

Here, as we already have discussed, evidence of defendant's gang activity and his rivalry with Northern gang members in general and the VCP clique in particular provides motive for the killing. (*People v. Sanchez* (2001) 26 Cal.4th 834, 849 ["Premeditation can be established in the context of a gang shooting even though the time between the sighting of the victim and the actual shooting is very brief."].) Arias's testimony that defendant used the term "buster" and, after looking at Leo and Arias, shot Leo, who was wearing a hat identifying him as member of VCP, further supports the gang motive. (*People v. Rand* (1995) 37 Cal.App.4th 999, 1001 ["A studied hatred and enmity, including a preplanned, purposeful resolve to shoot anyone in a certain neighborhood wearing a certain color, evidences the most cold-blooded, most calculated, most culpable, kind of premeditation and deliberation."].)

The texts between Astorga and defendant before and after the shooting support an inference that defendant arranged to pick up the gun from Astorga prior to the killing, which, in turn, shows planning. (*People v. Caro* (1988) 46 Cal.3d 1035, 1050 [evidence that the defendant armed himself showed planning].) This may be so even if defendant did not know Leo and, therefore, did not have a specific plan to kill him. (See *People v. Rand*, *supra*, 37 Cal.App.4th at p. 1001 [rejecting the defendant's argument that a

25.

""""kneejerk"""" reaction of shooting a suspected rival gang member would not be done with premeditation and deliberation].) Finally, the manner of killing—firing two shots at the victim's face at close range—supports an inference of premeditation. (*Mayfield*, *supra*, 14 Cal.4th at p. 768 ["the firing of the gun at Sergeant Wolfeley's face is a manner of killing that was entirely consistent with a preconceived design to take his victim's life"].)

In *People v. Manriquez* (2005) 37 Cal.4th 547, 564-566, the defendant killed a man in a bar. A witness testified that the victim was asleep at the bar when the defendant shot him. (*Id*. at p. 565.) The victim died of multiple gunshot wounds to the back. (*Id*. at p. 566.) The state Supreme Court found sufficient evidence to support premeditation, reasoning: "[T]he evidence adduced at trial revealed that defendant, having armed himself with a loaded firearm, approached the victim, who was asleep at the bar, grabbed him and shot him repeatedly in the back from very close range, causing multiple fatal gunshot wounds. The evidence was sufficient to establish premeditation and deliberation." (*Id*. at p. 578.) Similarly, in this case, the evidence was sufficient for the jury to find that defendant acted with premeditation and deliberation.

## IV.    CALCRIM No. 521

In his final argument, defendant claims the jury instruction on first and second degree murder did not adequately or correctly differentiate between premeditation and intent.

The jury was given CALCRIM No. 521 as follows:

"If you decide that the defendant has committed murder, you must decide whether it is murder of the first or second degree.

"The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant

26.

acted with *premeditation* if he decided to kill before completing the act that caused death.

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection. The length of time alone is not determinative.

"All other murders are of the second degree.

"The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

Defendant claims the instruction's description of premeditation ("The defendant acted with *premeditation* if he decided to kill before completing the act that caused death") blurs the distinction between premeditation and intent. He asserts it is misleading because a juror would be tempted "to mistakenly believe that a decision an instant before the killing suffices for first-degree murder."

As a preliminary matter, the Attorney General argues that defendant has forfeited this claim by not objecting to the instruction at trial. "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal. [Citations.]" (*People v. Lee* (2011) 51 Cal.4th 620, 638.) Defendant responds that "no forfeiture will be found where … the court's instruction was an incorrect statement of the law [citation], or the instructional error affected the defendant's substantial rights." (*People v. Mason* (2013) 218 Cal.App.4th 818, 823.) Defendant asserts there is no forfeiture here because his claim is that "CALCRIM No. 521 is *not* 'correct in law.'" Accordingly, we consider defendant's claim, but we conclude the claim fails on the merits.

27.

As we have mentioned, our Supreme Court has explained that "'premeditated' means 'considered beforehand.'" (*Mayfield*, *supra*, 14 Cal.4th at p. 767.) Defendant finds fault with the sentence, "The defendant acted with *premeditation* if he decided to kill before completing the act that caused death." We do not find this to be an incorrect statement of the law. In the context of the instruction, we see no meaningful distinction between "'considered beforehand'" (*ibid.*) and "decided to kill before" (CALCRIM No. 521).

Defendant argues that "[c]onsideration takes more time than decision." Again, defendant's argument seems to imply a certain amount of time must pass to find premediation, but "[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." (*Thomas*, *supra*, 25 Cal.2d at p. 900.) To the extent defendant's argument is that the act of "considering" is an additional requirement of first degree murder, we observe that "weigh[ing] the considerations for and against" *is* part of the instruction's definition of acting "deliberately."

Defendant quotes the following language from *People v Holt* (1944) 25 Cal.2d 59: "'Further, the use of "wilful, deliberate, and premeditated" in conjunction would seem to indicate that the legislature meant, by reiteration, to emphasize its intent to require, as an element of first degree murder, considerably more reflection than the mere amount of thought necessary to form the intention.'" (*Id.* at p. 87, quoting Pike, *What is Second Degree Murder in California?* (1936) 9 So.Cal. L.Rev. 112.) He then asserts, "That is the message that is missing from CALCRIM No. 521." We disagree.

The jury instruction provided in relevant part: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death." This instruction conveys to

28.

the jury that first degree murder requires more reflection than the amount of thought necessary for an intention to kill. For the foregoing reasons, we reject defendant's claim that CALCRIM No. 521 is not a correct statement in law.

### *DISPOSITION*

The judgment is affirmed.

_____
Kane, J.

WE CONCUR:


_____
Hill, P.J.


_____
Detjen, J.