Filed 2/15/23  P. v. Mendez CA2/8
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B305404 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA146527) |
| v. | |
| MARTIN ESAI MENDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  H. Clay Jacke, II, Judge.  Affirmed in part; reversed in part and remanded with directions.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Martin Esai Mendez appeals from his conviction for first degree murder arising from the shooting death of Daniel Infante. He contends the trial court made prejudicial evidentiary rulings admitting propensity evidence and that his first degree murder conviction and the true finding on the gang enhancement are not supported by substantial evidence.

In our original unpublished decision filed March 30, 2021, we affirmed defendant's conviction in its entirety.

Defendant sought and was granted review in the Supreme Court. While his petition was pending in the Supreme Court, Assembly Bill 333 was passed (2021–2022 Reg. Sess.), amending, among other things, Penal Code section 186.22. The amendments became effective January 1, 2022. (Stats. 2021, ch. 699, §§ 3, 4, 5.) The Supreme Court also issued its decision in *People v. Renteria* (2022) 13 Cal.5th 951 (*Renteria*).

On November 16, 2022, the Supreme Court transferred the case to us with directions to vacate our decision and reconsider the cause in light of *Renteria* and the passage of Assembly Bill 333. The parties filed supplemental briefing.

Having vacated our prior decision and reconsidered the matter in light of *Renteria* and the new legislation, we now reverse the true findings on the gang allegations and the enhancements imposed at sentencing. We otherwise affirm defendant's judgment of conviction and remand to the trial court for further proceedings consistent with this opinion.

**PROCEDURAL BACKGROUND**

Defendant was charged by information with murder (Pen. Code, § 187, subd. (a); count 1), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2), and possession of an assault

weapon (§ 30605, subd. (a); count 3). Firearm use allegations were alleged as to count 1 pursuant to section 12022.53, subdivisions (b) through (e)(1). Gang allegations were pled as to all three counts (§ 186.22, subd. (b)). In addition to two prison prior allegations (§ 667.5, subd. (b)), it was also alleged defendant had suffered a prior conviction that qualified as a serious or violent felony within the meaning of section 667, subdivision (a)(1) and as a strike prior (§§ 667, subds. (b)–(j), 1170.12). (Lillian Romero was alleged as a codefendant on the assault weapon charge and as an accessory after the fact. She is not a party to this appeal.)

The case was tried to a jury in August 2019. The jury found defendant guilty as charged. In a separate proceeding, the court found true the prior conviction allegations. The court then sentenced defendant to 25 years to life on count 1, doubled due to the strike prior, for a total sentence of 50 years to life. The court exercised its discretion to strike the firearm enhancement and the five-year prior. As to counts 2 and 3, the court struck the strike prior and imposed concurrent middle terms of two years, plus three years for the gang enhancement on both counts. The court awarded defendant 566 days of presentence custody credits and imposed fines and fees, staying both the restitution fine and the parole revocation fine.

## FACTUAL SUMMARY

Anthony S. testified he was hanging out at Cesar Chavez Park on the morning of July 10, 2018, when his friend Daniel Infante arrived. Mr. Infante was homeless and often stayed in the park. Marisol Salazar, another friend of Anthony's, was also at the park that morning, as was another mutual friend, Joel S. When Mr. Infante arrived, Ms. Salazar, who was living in her car

3

at the time, was sorting recyclable materials.  Mr. Infante remained nearby but was mainly keeping to himself.

At some point, Jocelyn M. arrived and began speaking to Ms. Salazar.  Anthony knew she was close with Ms. Salazar and he often saw them at the park together.  Jocelyn was dating Ms. Salazar's son.  Ms. Salazar considered Jocelyn to be her daughter-in-law.  Ms. Salazar's son was a member of defendant's gang, Barrio Los Padrinos.  (Ms. Salazar had sustained a criminal conviction related to her role in hiding a firearm used by her son in a previous shooting.)

Anthony saw defendant arrive at the park in a red Camaro. Defendant got out and approached Ms. Salazar who, unbeknownst to Anthony, was defendant's cousin.  Ms. Salazar chatted briefly with defendant and then she turned and pointed at Mr. Infante.

Defendant approached Mr. Infante and asked him where he was from.  Mr. Infante said he was from nowhere, that he was a "paisa," meaning someone who is not a gang member. Mr. Infante asked Ms. Salazar how she knew defendant, and Ms. Salazar said he was her cousin.  Defendant then patted down the outside of Mr. Infante's pants pockets, looking for weapons and finding none.  Mr. Infante sarcastically gestured toward his groin and told defendant to grab him there.

Defendant asked Mr. Infante if he had any drugs. Mr. Infante gave defendant some methamphetamine, and defendant inhaled it.  (The record also indicates they may have been smoking marijuana.  Anthony recalled they were drinking beer.)

Ms. Salazar stepped away to focus on her recyclables, and Jocelyn joined her.  As Ms. Salazar and Jocelyn were talking,

4

Jocelyn said Mr. Infante was still bothering her as he had been for months and asking her out on dates. Ms. Salazar called Mr. Infante over to her and told him to leave Jocelyn alone. Defendant, who was within earshot, then intervened, telling Mr. Infante to stop bothering Jocelyn. Defendant told him not to "mess with [his] family" or they were "going to have problems." Anthony testified defendant seemed upset. Anthony was aware that Mr. Infante had previously had some interactions in the park with Jocelyn. Mr. Infante seemed unafraid and remained disrespectful toward defendant, saying only something to the effect that if Jocelyn did not want to talk to him that was okay.

Defendant told Mr. Infante to "get the fuck out" of the park, "it's our park." Mr. Infante did not leave. Defendant pulled a handgun from his pocket, pointed it at Mr. Infante, and then dropped his arm back down at his side. Mr. Infante said, "If you're going to shoot, shoot. If you have the balls, shoot." Defendant again pointed his gun at Mr. Infante and shot him in the chest.

Defendant fled the park in his car. Mr. Infante started to walk away and then collapsed by the fence. Ms. Salazar cried out to Joel S. to call 911.

Anthony testified that prior to the shooting, he felt there were "bad vibes" so he walked away and did not see the actual shooting. Not long after, Anthony heard the gunshot.

Jocelyn testified she did not remember the events of that morning except that she heard an argument and then a gunshot. She testified she had been acquainted with Mr. Infante for about a year, during which he had made repeated sexual advances toward her. Before the day of the shooting, Jocelyn had told Ms. Salazar about Mr. Infante's advances, and Ms. Salazar had

told her to stay away from him. Jocelyn also knew Ms. Salazar had told Mr. Infante to leave her alone. It was common knowledge among Jocelyn's friends and family that Mr. Infante was "fixated on [her]" or "in love with her."

Deputy Sheriff Carlos Feria reported to the park with his partner in response to the 911 call. They were nearby in their patrol car so it took them only a few minutes to arrive at the park. They found Mr. Infante laying on the ground with a gunshot wound to his chest. He was having difficulty breathing and talking. Mr. Infante told Deputy Feria he had been shot by a bald, male Hispanic who was shirtless and driving a red Camaro with large rims. Mr. Infante said "he had ongoing issues" with the shooter who was a member of the Barrios Los Padrinos gang.

Joel reported that, before the shooting, he had seen Mr. Infante in an apparent argument with a bald Hispanic man who was shirtless.

Deputy Feria's partner broadcast the description of the shooting suspect and the car. Within a few minutes of hearing the broadcast, Deputy Daniel Ruiz and his partner saw defendant driving a red Camaro not far from the park. They pulled him over and detained him. Defendant was shirtless, wearing only black shorts, and "sweating a lot." The license plates for the car were covered with paper "plates" bearing a dealership logo.

Joel S. was taken to the location where defendant was being detained for a field identification. He identified defendant as the man who had been arguing with Mr. Infante. At trial, Joel S. testified he did not see the shooter's face and could not identify him.

Paramedics arrived and took Mr. Infante to the hospital where he died a short time later. An autopsy confirmed he died

from a gunshot wound to the chest.  There was "stippling" around the entrance wound which indicated the barrel of the gun was within two feet of his chest when it was fired.  A nine-millimeter bullet was recovered from his body.

Several recorded jail phone calls between defendant and his girlfriend (codefendant Romero) were admitted into evidence.  During the calls, defendant told Romero numerous times to get rid of or sell the "big one" and the "little one" or similar phrases believed by the investigating detectives to be references to firearms.  Defendant also repeatedly told Romero to get Kevin Osuna or "Easy" to help her.  In one call, defendant said "Easy has the other two . . . .  [¶]  . . .  [¶]  . . .  You know which two, right?  [¶]  . . .  [¶]  . . . .  The one I always keep on me; sell that one."  Another time defendant told Romero that someone named Flat Head "wants the one Easy has, not the one I always carry, the other one."  They also discussed "the one" that was at Romero's house.

The murder weapon was never found.

Defendant's cell phone was recovered from his car.  Photographs downloaded from that phone depicted defendant with Kevin Osuna (Easy) in Osuna's garage.  Defendant was holding a handgun in one of the photographs.  A sign in the garage referenced Barrio Los Padrinos.

Security video obtained from businesses located near the park showed portions of the incident, including a red Camaro entering and leaving the parking lot, a man wearing black shorts talking to Mr. Infante near a picnic table, and Mr. Infante grabbing his stomach and trying to run away.

A search was conducted at defendant's home and a nine-millimeter live round was found under the cushions of the couch

where defendant's brother said defendant usually slept.

Amanda Davis, a senior criminalist and expert in firearms identification for the sheriff's department, testified the bullet recovered from Mr. Infante's body was from a nine-millimeter handgun. She also reviewed the photograph of defendant holding a gun downloaded from his phone and opined it was consistent in appearance with a nine-millimeter handgun. She conceded she could not be certain from just viewing the photograph that it was a nine-millimeter handgun.

Evidence was presented that in January 2012, defendant admitted being a member of the Barrio Los Padrinos gang during a traffic stop. The deputy who completed the field identification card also noted defendant's gang moniker was "Little Loc" and noted his gang tattoos. Defendant again self-admitted his gang membership during a consensual pedestrian stop in 2014 with a different officer.

Detective Michael Haggerty testified as the prosecution's gang expert. He discussed the history and primary activities of the Barrio Los Padrinos gang and its claimed territory. The park where the shooting occurred was adjacent to their territory. Detective Haggerty described defendant's gang-related tattoos, including one on his arm resembling the Major League Baseball logo but with the player holding a rifle instead of a baseball bat indicating defendant held himself out as a "major league gunner." Detective Haggerty authenticated the two predicate criminal acts committed by two Barrio Los Padrinos members and discussed gang lifestyle generally. Detective Haggerty explained that respect and fear are important in gang culture. Gangs engage in violent acts to maintain their reputation and territory and to

instill fear in the community and discourage individuals from reporting their activities or cooperating with law enforcement.

Significantly, with respect to the shooting in this case, Detective Haggerty testified he had reviewed a report that prior to the shooting, defendant had received a phone call from someone in custody telling defendant that a fellow gang member's girlfriend was being harassed.

When asked a hypothetical based on the facts of the shooting, Detective Haggerty stated his opinion that the murder of an individual who had been harassing a fellow gang member's girlfriend would have been committed for the benefit of the gang. He said it was not unusual that before the shooting, defendant used drugs with the victim, as that was a "common tactic" of getting a person to lower their guard.

During her trial testimony, Ms. Salazar admitted she did not want to testify and confirmed that after she received the subpoena to appear at trial, members of the Barrio Los Padrinos gang confronted her and told her not to go to court. Joel S. also admitted during his testimony that he did not want to be labeled a snitch and that having to testify in court made him worried for his family.

Defendant did not present any witnesses.

## DISCUSSION

*Renteria* and Assembly Bill 333 do not affect our original analysis and conclusions regarding defendant's claimed evidentiary error and the lack of substantial evidence supporting his first degree murder conviction. We again reject those contentions, incorporating our original discussion of those issues without change. However, we agree with the parties that the true findings on the gang allegations and the sentence

9

enhancements imposed pursuant to Penal Code section 186.22 must be reversed in light of the passage of Assembly Bill 333.

## 1.    The Evidentiary Rulings

Defendant contends the trial court committed prejudicial evidentiary errors that violated his rights to due process and a fair trial.  He says the court should have precluded the recorded jail phone call in which he admitted a prior murder and the photograph of him holding a handgun because both were improper propensity evidence.

We review the admission of evidence under Evidence Code section 1101 and section 352 under the deferential abuse of discretion standard.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1328 (*Foster*).)  Moreover, our Supreme Court has rejected efforts to inflate "garden-variety evidentiary questions into constitutional ones."  (*People v. Boyette* (2002) 29 Cal.4th 381, 427; see *id.* at pp. 427–428 [only when evidentiary error results in the complete preclusion of a defense does possible due process violation occur]; accord, *People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.)  We find no evidentiary errors, nor any constitutional violations in the court's rulings on this evidence.

### a.    Admission of the jail phone call

The prosecution sought to introduce a recording of a jail phone call between defendant, codefendant Romero and Kevin Osuna (Easy), during which defendant said, "I'll kill another motherfucker.  Nah.  It ain't the first and it won't be the last." (The actual statements by defendant during the phone call were a mix of both Spanish and English and this was the agreed-upon translation presented to the jury.)

During a hearing pursuant to Evidence Code section 402, defendant objected, arguing the statement could be viewed by the

10

jury as an admission by defendant that he had previously killed someone ("It ain't the first"). The prosecutor argued it was relevant to show defendant intended to kill Mr. Infante. Defendant's statement showed a cavalier attitude about killing in contrast to defendant's defense that the shooting was unintended and rash. It was the prosecution's burden to prove the shooting was premeditated and not the result of an accidental shooting or a shooting in the heat of passion aroused by Mr. Infante's disrespect after defendant told him to stop harassing the girlfriend of a fellow gang member and to leave the park. The prosecutor also argued the statement was relevant to the gang allegation because defendant was telling Easy he was willing to put in work to gain respect.

The court overruled defendant's objection. Defendant argued that if the statement was to be admitted, then the entire conversation should be admitted for context, to show defendant was just "using bravado" when speaking with Easy. The court allowed the entire conversation to be admitted with some redactions.

We find no abuse of discretion by the trial court in admitting the statement. As relevant here, Evidence Code section 1101, subdivision (b) provides that "[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." " 'The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . . In order to be admissible to prove intent, the uncharged conduct must be sufficiently similar to support the inference that

11

the defendant " 'probably harbor[ed] the same intent in each instance.' " ' " (*Foster*, *supra*, 50 Cal.4th at p. 1328.)

The statement was more probative than prejudicial. There were no details presented about the prior killing that would have inflamed the passions of the jury against defendant, confused the jury or resulted in an undue consumption of time. The statement was brief and highly probative of defendant's intent at the time of the charged offense.

### b. Admission of the photograph

Defendant also argues the court erred in admitting the photograph of him holding a handgun. The photograph was downloaded from defendant's cell phone and showed him at Easy's home holding a handgun. Ms. Davis, the firearms expert, testified that while she could not be certain just from the photograph, it was her opinion the gun looked like a nine-millimeter handgun. Defendant says there was no evidence it was the murder weapon and it was therefore irrelevant and prejudicial. Over defendant's objection, the court ruled the photograph was admissible, as was the opinion of Ms. Davis about what type of handgun defendant was holding in the photograph. We find no error.

There was substantial evidence that defendant kept and used guns apart from the photograph. The victim was fatally shot with a nine-millimeter handgun, a nine-millimeter live round was found under the cushions of the couch on which defendant slept, and in recorded jail phone calls defendant told his girlfriend to ask Easy to help her get rid of guns kept at her home and at Easy's home and to sell "the one I always carry."

The prosecutor did not introduce the photograph to portray defendant as a bad character who possessed guns, but to prove he

was in possession of and had access to a gun of the same type as the murder weapon.

The trial court did not abuse its discretion in admitting the photograph or Ms. Davis's testimony. Defendant was free to argue Ms. Davis's lack of certainty as to whether the handgun was in fact a nine-millimeter and the reasonableness of the prosecution's assertion that it was the murder weapon. It was for the jury to decide the weight to give this circumstantial evidence and it was not error to allow the jury to consider it. (*People v. Sanchez* (2019) 7 Cal.5th 14, 56 ["Evidence that shortly before the murders defendant possessed a firearm that could have been the murder weapon was similarly relevant and admissible as circumstantial evidence that he committed the murders . . . . [W]e see no abuse of discretion in not excluding the evidence as unduly prejudicial under Evidence Code section 352."]; accord, *People v. Carpenter* (1999) 21 Cal.4th 1016, 1052.)

Because neither the jail phone call nor the photograph was admitted in error, there is no merit to defendant's cumulative prejudice argument.

## 2. First Degree Murder

In resolving a question of substantial evidence in a criminal case, our role "is a limited one." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "[W]e must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*Ibid.*) We do not resolve credibility

issues or conflicts in the evidence.  "[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact."  (*Ibid.*)

Defendant argues the evidence at best shows an impulsive shooting in the heat of the moment, but no premeditation.  He says there is no evidence he knew the victim or knew he would be in the park that morning.  He contends the evidence shows only that he overheard a conversation his cousin Ms. Salazar was having about Mr. Infante harassing Jocelyn, that he argued with Mr. Infante about the harassment, and then shot him in response to a taunt from Mr. Infante.  Defendant argues the fact the shooting occurred in broad daylight in front of people who could readily identify him also demonstrates the rash nature of the shooting.

In assessing the evidence in support of a premeditation finding, we are guided by *People v. Anderson* (1968) 70 Cal.2d 15 and its progeny.  *Anderson* identified three categories of evidence that may be helpful in reviewing the sufficiency of evidence supporting a first degree murder verdict:  "planning activity, preexisting motive, and manner of killing."  (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069 (*Mendoza*), citing *Anderson*, at pp. 26–27.)  Since *Anderson*, the Supreme Court has repeatedly made clear that "[t]hese three categories are merely a framework for appellate review; they need not be present in some special combination or afforded special weight, nor are they exhaustive." (*People v. Booker* (2011) 51 Cal.4th 141, 173; accord, *Mendoza*, at p. 1069 & *People v. Manriquez* (2005) 37 Cal.4th 547, 577 (*Manriquez*).)

Here, there was evidence of premeditation and planning activity.  (See, e.g., *People v. Marks* (2003) 31 Cal.4th 197, 230

14

[sufficient evidence of premeditation where the defendant ordered another individual out of the car before confronting and shooting the victim at close range with no evidence of provocation or struggle].) Defendant arrived at the park carrying a handgun concealed in his clothing. Anthony saw defendant speak with Ms. Salazar who then pointed at Mr. Infante, raising an inference defendant came to the park specifically to find and confront Mr. Infante. Defendant spoke to Mr. Infante and patted him down to verify he was not armed. Defendant then told Mr. Infante to stop messing with his family and to stop harassing Jocelyn. Defendant yelled and cursed at Mr. Infante to get out of the park. When Mr. Infante did not leave, defendant pointed his gun directly at him. When Mr. Infante told him to go ahead and shoot, defendant shot him at close range in the chest.

The relatively short timeframe in which the crucial events occurred is not dispositive. The Supreme Court has repeatedly emphasized that " '[t]he process of premeditation and deliberation does not require any extended period of time.' " (*Manriquez*, *supra*, 37 Cal.4th at p. 577.) " ' " 'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " ' " (*Mendoza*, *supra*, 52 Cal.4th at p. 1069; accord, *People v. Brito* (1991) 232 Cal.App.3d 316, 323–324 [fact that the defendant made decision, within a matter of a few seconds, to shoot fleeing victim in back did not defeat finding of deliberation].)

In addition to premeditation and planning, there was evidence of a preexisting motive, that Mr. Infante had been harassing the girlfriend of a member of defendant's gang.

15

The shooting at close range in a vital area of Mr. Infante's body—in the chest—is further evidence of premeditation. The fatal shooting left stippling around the entrance wound indicating the barrel of defendant's gun was no further than two feet from Mr. Infante. (*People v. Caro* (1988) 46 Cal.3d 1035, 1050 ["a close-range gunshot to the face is arguably sufficiently 'particular and exacting' to permit an inference that defendant was acting according to a preconceived design"]; *Manriquez, supra*, 37 Cal.4th at pp. 578–579 [evidence the defendant armed himself with a concealed weapon, confronted the victim, and fired several shots into his chest was sufficient to support first degree murder].)

We find substantial evidence supports the jury's premeditation finding. Defendant's argument ignores most of this evidence and invites us to reweigh the evidence and the credibility determinations made by the jury. We decline to do so.

**3.     The Gang Allegation and Enhancements**

In supplemental briefing, defendant requests that all gang enhancements be reversed. The People concede the amendments to Penal Code section 186.22 are retroactive and that the true findings on the gang allegations and the enhancements imposed at sentencing must be reversed. We agree.

In *Renteria*, the Supreme Court acknowledged that Assembly Bill 333 "narrowed the scope" of the enhancement provisions of Penal Code section 186.22, subdivision (b). (*Renteria, supra*, 13 Cal.5th at p. 961.) Indeed, the amendments to section 186.22 increase the evidentiary showing needed to support a true finding and imposition of a sentencing enhancement. Assembly Bill 333 changed, among other things, the definition of "pattern of criminal gang activity" specifying the

16

benefit to the gang must be more than reputational, and eliminated certain crimes like looting and felony vandalism as qualifying predicate offenses.  (Stats. 2021, ch. 699, §§ 3, 4.)

The amendments to Penal Code section 186.22 apply retroactively to defendant whose conviction is not yet final. (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1087 [amendments to § 186.22 that became effective Jan. 1, 2022, apply retroactively to nonfinal cases under rule of *In re Estrada*]; see also *In re Estrada* (1965) 63 Cal.2d 740, 742–748; *People v. Vieira* (2005) 35 Cal.4th 264, 305–306 ["a defendant generally is entitled to benefit from amendments that become effective while his case is on appeal"].)

Accordingly, the true findings on the gang enhancements on all counts and the gang enhancements imposed at sentencing are reversed.  On remand, the prosecution shall have the opportunity to retry the gang allegations under the amended requirements of Penal Code section 186.22.

## DISPOSITION

The true findings on the gang allegation and the sentence enhancements imposed pursuant to Penal Code section 186.22 as to all three counts are reversed.  The judgment of conviction is affirmed in all other respects.  The case is remanded for further proceedings consistent with this opinion.


GRIMES, J.

WE CONCUR:


STRATTON, P. J.              WILEY, J.

17